TELEPHONE EQUIPMENT
NETWORK, INC.,
Appellant,

v.

TA/WESTCHASE PLACE,
LTD., Appellee.

No. 01–01–00650–CV.

Court of Appeals of Texas,
Houston (1st Dist.).

March 21, 2002.

Rehearing Overruled Aug. 8, 2002.

Kent M. Hanszen, Houston, for Appellant.

Virginia Beth Edler, Wilson, Cribbs, Goren & Flaum, P.C., Houston, for Appellee.

Panel consists of Justices MIRABAL, HEDGES, and JENNINGS.

## OPINION

MARGARET GARNER MIRABAL, Justice.

In this accelerated, interlocutory appeal, Telephone Equipment Network, Inc. ("TEN") appeals the trial court's order granting a temporary injunction enjoining it from foreclosing on and disposing of property owned by Telephone Liquidation, Inc. f/k/a Charles Tharp, Inc. d/b/a Southwest Communications, Inc., in which TEN claims a security interest.[1]  The trial court

---

1. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 51.014(a)(4) (Vernon Supp.2002) (stating

granted the temporary injunction in favor of TA/West Chase Place, Ltd. (Westchase) based on Westchase's claims that TEN had participated in violating the Texas Uniform Fraudulent Transfer Act.[2] We affirm.

## FACTUAL BACKGROUND

The relevant, underlying facts of the case are undisputed and derived from the evidence presented at the hearing on the temporary injunction.

In 1996, Charles Tharp, Inc. d/b/a Southwest Communications, Inc. (Southwest) obtained a line of credit with Sterling Bank secured by all of Southwest's assets. Sterling had perfected its security interest in Southwest's assets by filing a UCC–1 financing statement. In 1998, Southwest transferred the revolving debt under the line of credit into non-revolving debt by signing a promissory note with Sterling Bank for $25,000. In 2000, Southwest signed two more promissory notes with Sterling Bank for $20,000 and $30,000. The three promissory notes were also secured by all of Southwest's assets as stated in the previously filed financing statement. Charles Tharp, vice-president and president, as well as 100 percent shareholder, of Southwest signed the promissory notes on behalf of Southwest and personally guaranteed the notes.

On December 22, 1999, Southwest entered into a commercial lease agreement with Westchase to rent space in Westchase's office building. Tharp signed the lease as corporate representative; Tharp did not sign the lease individually as guarantor. The lease provided the commencement date was the earlier of the completion date of the leasehold improvements or April 1, 2000. Under the terms of the lease, default occurred if Southwest failed to pay rent or occupy the premises.

On January 20, 2000, Charles Tharp sent Westchase a letter stating Southwest was terminating its business relationship with Westchase and would not move into the leased office space. The reason for the termination, as stated in the letter, was a dispute between Southwest and Westchase relating to the office's floor plans.

Westchase sent Southwest a letter on January 27, 2000, stating that Southwest's conduct was an anticipatory breach of the lease agreement and requested that Southwest cure the default. Westchase also informed Southwest that it intended to enforce Southwest's obligations under the terms of the lease by filing suit. Southwest never paid Westchase any rent or occupied the office space. On July 11, 2000, Westchase filed suit against Southwest for breach of contract.

Tharp was also vice president, president, and 100 per cent shareholder of TEN. TEN was located at the same business address as Southwest.

Tharp sent a letter to Sterling Bank on October 24, 2000, notifying the bank that he, as president of TEN, would like to purchase the three promissory notes that Southwest had signed in favor of Sterling Bank for the combined outstanding balance on the notes. Sterling Bank accepted the offer and sold TEN the notes for the outstanding balance of $59,409.57. TEN obtained the $59,409.57 to purchase the notes from Tharp.[3]

---

party may appeal trial court's interlocutory order granting temporary injunction).

**2.** *See* TEX. BUS. & COM.CODE ANN. §§ 24.001–.013. (Vernon 1987 & Vernon 2002).

**3.** TEN's 2000 income tax statement showed that it had a negative income of $16 for that year.

At the temporary injunction hearing, Tharp admitted that the only purpose of TEN is to "hold some loans" made to Southwest. When Tharp gave the funds to TEN to purchase the notes, he knew Westchase had sued Southwest for breach of contract. Tharp also admitted he could have given the $59,409.57 directly to Southwest to pay off the balance of the loans owed to Sterling Bank, but instead chose to give the money to TEN to purchase the notes.

On May 10, 2001, Southwest changed its corporate name from "Charles Tharp, Inc. d/b/a Southwest Communications, Inc." to "Telephone Liquidation, Inc." Tharp changed the corporate name because a possibility existed that Southwest would file bankruptcy and he did not want his name associated with bankruptcy. None of Southwest's creditors were notified of the corporate name change.

TEN filed an amended financing statement on May 23, 2001, giving notice that Sterling Bank's security interest in Southwest's assets had been assigned to TEN. Before TEN purchased the promissory notes, Southwest had always made the loan payments to Sterling Bank on time. But, after TEN purchased the notes, Southwest never made another payment. On May 25, 2001, Westchase received notice that TEN, as a secured creditor, intended to foreclose and sell all of Southwest's property, including inventory, equipment, and accounts receivable at a public sale on May 31, 2001. The notice indicated that Southwest's assets had a "book value" of $247,622. The sale was to be conducted at the law offices of Stewart A. Feldman, who represents both TEN and Southwest. Tharp testified that TEN

intended to foreclose on the promissory notes and to bid on Southwest's assets at the public sale.

Tharp testified that he also believed, as a guarantor, he still had personal liability under the promissory notes even after they were purchased by TEN. He admitted it was unlikely that he would sue himself to collect on the amounts due under the promissory notes.

## PROCEDURAL HISTORY

Westchase filed suit against TEN on May 30, 2001, seeking injunctive relief to prevent the sale of Southwest's property.[4] Citing to the corporate affiliations between the companies and the circumstances surrounding the assignment of the security interest to TEN, Westchase alleged that TEN and Southwest were attempting to perpetuate a fraud against Westchase in violation of the Uniform Fraudulent Transfer Act ("UFTA"). Westchase alleged that if TEN was allowed to sell all of Southwest's property, Southwest would have insufficient assets to satisfy any judgment that Westchase obtained in its earlier filed breach of contract action.

The trial court conducted the evidentiary hearing on Westchase's request for a temporary injunction on July 6, 2001. At the conclusion of the hearing, the trial court signed an order granting the temporary injunction. The order provides, in part, as follows:

[T]he Court finds that [Westchase] will probably prevail on the trial of this cause; that [TEN] intends to foreclose upon and dispose of the corporate assets of [Southwest], in violation of the Uniform Fraudulent Transfer Act, before the Court can render judgment in this

4. This suit was separate from the previously filed breach of contract suit Westchase had filed against Southwest. Although not shown in the record, TEN indicates in its brief that

the breach of contract action against Southwest and the later filed action against TEN, which is the action underlying this appeal, have been consolidated.

cause. The Court finds that if [TEN] carries out that intention, [TEN] will alter the status quo and tend to make ineffectual a judgment in favor of [Westchase], because [TEN] will have previously foreclosed upon and disposed of the corporate assets currently in [TEN's] possession or in the possession of [Southwest]. The Court further finds that unless [TEN] is deterred from carrying out the foreclosure sale, [Westchase] will be without adequate remedy at law in that all of the corporate assets of [Southwest], currently in [TEN's] possession, will be sold, most likely to [TEN] and most likely for much less than their value and for very little consideration, leaving the potential debtor, [Southwest], as an empty shell. The Court also finds that [Westchase] will likely prevail in [the earlier filed breach of contract action.]

IT IS, THEREFORE, ORDERED that [TEN] is commanded to desist and refrain from foreclosing upon, selling, disposing of, or transferring any assets which [TEN] claims an interest to by virtue of an alleged security interest in the inventory, equipment, accounts, instruments, documents, chattel paper and other rights to payment, assets, collateral and/or general intangibles of [Southwest].

Although the trial court did not file formal findings of fact and conclusions of law, it stated its findings supporting the order granting the temporary injunction at the conclusion of the temporary injunction hearing. Specifically, the trial court stated:

- Westchase is likely to prevail on its breach of contract claim against Southwest.
- TEN seeks to remove all of Southwest's assets which would make it unable to respond to any damages awarded to Westchase.
- The loans made by Sterling Bank were not in default when TEN purchased the promissory notes.
- Charles Tharp, who is the sole owner of Southwest, deliberately put Southwest in default when TEN purchased the notes.
- Buying the promissory notes from Sterling Bank was not the only option available to TEN.
- TEN could have reduced the monthly payments that Southwest had to make on the notes, or Tharp could have loaned the money to Southwest rather than TEN.
- Tharp was "colluding with himself to get all of Southwest's assets out of Southwest free and clear to put the assets in some other company that Mr. Tharp owned and leaving all suppliers, providers and other creditors holding debts from an empty shell in Southwest."
- On final trial, "more than likely it will be found that the security interest is fraudulent itself and by 'fraudulent,' I don't mean Mr. Tharp is a bad person, but I think that the business procedure that he used in this case will likely [be] . . . found to be fraudulent . . ., and, therefore, be set aside."

On appeal, TEN complains the trial court misapplied the law to the undisputed facts. In two points of error, TEN contends that the trial court erred in granting the temporary injunction because (1) Southwest's assets are not enjoinable under UFTA; (2) the temporary injunction is tantamount to an improper pre-judgment attachment; and (3) Westchase failed to show that it was entitled to the injunction because it will suffer an irreparable injury and has no adequate remedy at law.

## STANDARDS FOR TEMPORARY INJUNCTIONS

The sole issue before a trial court in a temporary injunction hearing is whether the applicant may preserve the status quo, pending trial on the merits. *Davis v. Huey*, 571 S.W.2d 859, 862 (Tex. 1978); *T–N–T Motorsports, Inc. v. Hennessey Motorsports, Inc.*, 965 S.W.2d 18, 21 (Tex.App.-Houston [1st Dist.] 1998, pet. dism'd). To be entitled to a temporary injunction, an applicant must plead a cause of action, show a probable right to recover on that cause of action, and show a probable injury in the interim. *Sun Oil Co. v. Whitaker*, 424 S.W.2d 216, 218 (Tex.1968); *T–N–T Motorsports*, 965 S.W.2d at 23. A probable right of success on the merits is shown by alleging a cause of action and presenting evidence that tends to sustain it. *T–N–T Motorsports*, 965 S.W.2d at 23–24. Probable injury includes elements of imminent harm, irreparable injury, and no adequate remedy at law for damages. *Id.* at 24.

Because an appeal of an order granting or denying a temporary injunction is an appeal from an interlocutory order, the merits of the applicant's case are not presented for appellate review. *Davis*, 571 S.W.2d at 861; *T–N–T Motorsports*, 965 S.W.2d at 21. Rather, the decision to grant or deny a temporary injunction lies within the sound discretion of the trial court, and we will not reverse that decision absent an abuse of discretion. *Walling v. Metcalfe*, 863 S.W.2d 56, 58 (Tex.1993); *City of Houston v. Todd*, 41 S.W.3d 289, 294 (Tex.App.-Houston [1st Dist.] 2000, pet. denied). We will not substitute our judgment for that of the trial court, but will only determine whether the court's action was so arbitrary as to exceed the bounds of reasonable discretion. An erroneous application of the law to undisputed facts will constitute an abuse of discretion. *City of Spring Valley v. Southwestern Bell Tel. Co.*, 484 S.W.2d 579, 581 (Tex.1972); *Todd*, 41 S.W.3d at 294. We draw all legitimate inferences from the evidence in the light most favorable to the trial court's order. *T–N–T Motorsports*, 965 S.W.2d at 21.

## UNIFORM FRAUDULENT TRANSFER ACT

The purpose of UFTA is to prevent fraudulent transfers of property by a debtor who intends to defraud creditors by placing assets beyond their reach. *Connell v. Connell*, 889 S.W.2d 534, 542 (Tex.App.-San Antonio 1994, writ denied). UFTA creates a statutory cause of action through which a creditor may seek recourse for a fraudulent transfer of assets or property. *Blackthorne v. Bellush*, 61 S.W.3d 439, 443 (Tex.App.-San Antonio 2001, no pet.); *Jackson Law Office, P.C. v. Chappell*, 37 S.W.3d 15, 25 (Tex. App.-Tyler 2000, pet. denied). The act provides that a transfer of an asset is fraudulent, as to a creditor, if the debtor made the transfer with the actual intent to hinder, delay or defraud any of the debtor's creditors.[5] TEX. BUS. & COM.CODE ANN. § 24.005(a)(1) (Vernon Supp.2002). UFTA lists 11, non-exhaustive "badges of fraud" to assist in determining whether the debtor made the transfer with the requisite fraudulent intent. *Id.* § 24.005(b)(1)-(11).

The list includes whether: (1) the transfer or obligation was to an insider; (2) the

---

5. The act defines "creditor" as a person to whom a "claim" is owed. TEX. BUS. & COM. CODE ANN. § 24.002(4) (Vernon Supp.2002). A "claim" is "a right to payment or property, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." *Id.* § 24.002(3).

debtor retained possession or control of the property transferred after the transfer; (3) the transfer or obligation was concealed; (4) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit; (5) the transfer was of substantially all the debtor's assets; (6) the debtor absconded; (7) the debtor removed or concealed assets; (8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred; (9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred; (10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and (11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor. *Id.*

When a creditor establishes a fraudulent transfer, section 24.008 sets forth the remedies available to the creditor. *See id.* § 24.008 (Vernon 1987). The section 24.008 remedies include an avoidance of the obligation to the extent necessary to satisfy the creditor's claim, an attachment against the asset transferred, or, subject to applicable principles of equity and in accordance with the rules of civil procedure, an injunction against further disposition of the asset transferred, the appointment of a receiver to take charge of the asset transferred, or any other relief the circumstances may require. *See id.*

## DISCUSSION

### A. ASSETS SUBJECT TO A VALID LIEN NOT ENJOINABLE

In the first part of point of error one, TEN complains the trial court erred in enjoining it from foreclosing on and selling Southwest's assets because, as defined by UFTA, Southwest's assets cannot be the subject of an injunction. Under section 24.008, a creditor may obtain "an injunction against further disposition by the debtor or transferee, or both, of the *asset* transferred or of other property." *Id.* § 24.008(a)(3)(A) (Vernon 1987) (emphasis added). UFTA defines "asset" as the property of the debtor, but excludes "property to the extent it is encumbered by a valid lien." *Id.* § 24.002(2) (Vernon 1987) (emphasis added). A "valid lien" is one that "is effective against the holder of a judicial lien subsequently obtained by legal or equitable process or proceedings." *Id.* § 24.002(13). If Westchase prevails on its breach of contract action against Southwest, it may acquire a judicial lien against Southwest's assets. The question then becomes whether TEN's lien on Southwest's property would be "effective" against Westchase's judicial lien.

TEN argues it has a valid lien in Southwest's assets that is derived from Sterling Bank's security interest dating back to 1996. However, as noted by the trial court at the conclusion of the temporary injunction hearing, TEN has not possessed the security interest since 1996; rather, TEN only obtained the security interest after Westchase filed its breach of contract suit against Southwest.

Additionally, TEN fails to address an obvious flaw in the logic of its argument that Southwest's property is not an enjoinable asset. The flaw is TEN's presumption that its security interest in Southwest's property will not be found to be voidable as part of a fraudulent transfer or obligation under UFTA. If the lien is found to be voidable, it will not be effective against a judicial lien obtained by Westchase.

The assignment of Sterling Bank's security interest to TEN is an integral part of the alleged fraudulent transfer of assets at issue in this suit. Particularly, the assignment of the security interest in South-

west's property was but the first step in the alleged fraudulent transfer of Southwest's assets to TEN. If Westchase ultimately prevails at trial on the merits of its UFTA claims, TEN's security interest, as part of the fraudulent transfer of assets, will be voidable. *See id.* § 24.008; *see also J. Michael Putman, M.D.P.A. Money Purchase Pension Plan v. Stephenson,* 805 S.W.2d 16, 20 (Tex.App.-Dallas 1991, no writ). Thus, to the extent the evidence supports a probable right of recovery by Westchase under UFTA, TEN's contention that Southwest's property is not an enjoinable asset fails.

Here, a probable right of recovery exists if the evidence was sufficient for the trial court to find an actual intent to defraud Westchase. The trial court stated on the record that it believed TEN's security interest in Southwest's assets will be found to be "fraudulent." Applying the "badges of fraud" listed in subsection 24.005(b), we conclude evidence exists in the record to support such a finding.

▬ First, the evidence suggests TEN was an "insider." *See* Tex. Bus. & Com.Code Ann. § 24.005(b)(1). Although TEN does not fall within one of the categories of "insiders" defined by UFTA, the list is not exclusive, but is intended to be for purposes of illustration. *Chappell,* 37 S.W.3d at 25–26. In general, an "insider" is an entity whose close relationship with the debtor subjects any transactions made between the debtor and the insider to heavy scrutiny. *Id.* at 26. The principal factors in determining insider status are (1) the closeness of the relationship between the transferee and debtor, and (2) whether the transactions were at arm's length. *Id.* (citing *In re Holloway,* 955 F.2d 1008, 1010 (5th Cir.1992)). Based on the common ownership and management of TEN and Southwest, as well as the fact that they share business addresses, the evidence suggests TEN is an "insider."

Evidence was also presented suggesting that an attempt was made to conceal the obligation Southwest owed to TEN. Tex. Bus. & Com.Code Ann. § 24.005(b)(3). Although TEN paid off Southwest's debt to Sterling Bank in October 2000, the assignment of Sterling Bank's security interest in Southwest's property was not filed until May 23, 2001. The notice of the public sale of Southwest's assets, which was scheduled to occur on May 31, was not sent to Westchase until May 25, 2001.

The undisputed evidence shows that at the time TEN obtained a security interest in Southwest's property, Southwest had already been sued by Westchase for breach of contract. *See id.* § 24.005(b)(4). It is also undisputed that TEN intended to foreclose on *all* of Southwest's assets. *See id.* § 24.005(b)(5).

The undisputed evidence also shows the value of the consideration received by Southwest was not reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred. *See id.* § 24.005(b)(8). While the value of Southwest's assets is $247,622, TEN paid only $59,409.57 to Sterling Bank to purchase the three promissory notes.

Additionally, the evidence showed Southwest defaulted on the promissory notes as soon as they were purchased by TEN, which allowed TEN to pursue foreclosure of Southwest's assets. However, Southwest had never been late on its payments to Sterling Bank on the same notes. We agree with the trial court that such evidence is "significant" and is suggestive of an intent to defraud Westchase, as is the evidence that the only corporate purpose that TEN serves is to hold the promissory notes.

■ In relation to TEN's contention that the trial court erred in issuing the temporary injunction because Southwest's assets are not enjoinable assets under UFTA, we find the trial court did not abuse its discretion in issuing the temporary injunction.[6]

## B. "PRE–JUDGEMENT ATTACHMENT"

■ In the second part of its point of error one, TEN contends the temporary injunction issued by the trial court amounts to an improper pre-judgment attachment of assets. In support of its contention, TEN cites *Harper v. Powell*, 821 S.W.2d 456, 456–57 (Tex.App.-Corpus Christi 1992, no writ), and *Lane v. Baker*, 601 S.W.2d 143, 145 (Tex.Civ.App.-Austin 1980, no writ), for the proposition that, when a claim is not against specific assets, a temporary injunction cannot be obtained prohibiting a party from disposing of property that could be used to satisfy a possible future judgment. However, TEN's reliance on these cases is misplaced because neither *Harper* nor *Lane* involved claims brought under UFTA.

As previously mentioned, UFTA expressly provides that a plaintiff may obtain an injunction against further disposition of "the asset transferred or of other property." TEX. BUS. & COM.CODE ANN. § 24.008(a)(3). Here, the trial court enjoined the further disposition of Southwest's assets that were affected by the alleged fraudulent transfer. Thus, the assets subject to the temporary injunction are the type of assets that the legislature contemplated could be subject to injunction under UFTA. We conclude that the temporary injunction was not an improper pre-judgment attachment of property as claimed by TEN.

We overrule TEN's first point of error.

## C. IRREPARABLE INJURY AND NO ADEQUATE LEGAL REMEDY

■ In point of error two, TEN complains Westchase was not entitled to injunctive relief because it failed to show irreparable injury and no adequate remedy at law. To prove an inadequate remedy at law, Westchase was required to show that its damages are incapable of calculation or that Southwest is incapable of responding in damages. *See SRS Prods. Co. v. LG Eng'g Co.*, 994 S.W.2d 380, 386 (Tex.App.-Houston [14th Dist.] 1999, no pet.); *Haq v. America's Favorite Chicken Co.*, 921 S.W.2d 728, 730 (Tex.App.-Corpus Christi 1996, writ dism'd w.o.j.). Similarly, irreparable harm can be demonstrated by showing that damages cannot be measured by any certain pecuniary standard. *See SRS Prods.*, 994 S.W.2d at 386; *Haq*, 921 S.W.2d at 730.

---

**6.** Moreover, the undisputed evidence shows the security interest TEN obtained from Sterling Bank was less than the value of Southwest's assets. Specifically, the book value of Southwest's assets is $247,622, while the amount of TEN's lien encumbering the Southwest's property is $59,409.57. As stated above, Southwest's property is excluded from being an asset only "to the extent" it is encumbered by TEN's lien. TEX. BUS. & COM.CODE ANN. § 24.002(2)(A). Thus, under the plain language of the UFTA, the value of Southwest's property in excess of TEN's lien encumbering the property would be an "asset" as defined by UFTA. *Id.* Other jurisdictions implementing versions of the model UFTA have given the same interpretation to similar language. *See Oregon Account Sys., Inc. v. Greer*, 165 Or.App. 738, 744–45, 996 P.2d 1025, 1027–28 (2000) (holding equity in property in excess of amount of lien is "asset" as defined in Oregon UFTA); *In re McFarland*, 170 B.R. 613, 623 (Bankr.S.D.Ohio 1994) (considering equity value in excess of the amount of existing valid liens as an asset under Ohio law); *Rich v. Rich*, 185 W.Va. 148, 151, 405 S.E.2d 858 (1991) (holding if property contains equity in excess of liens encumbering it, excess equity is "asset" under West Virginia UFTA).

 TEN argues that any damages suffered by Westchase in the breach of contract action are compensable through quantifiable money damages, and, therefore, Westchase has not demonstrated irreparable injury or that no adequate remedy at law exists. However, a plaintiff does not have an adequate remedy at law if the defendant is insolvent. *Blackthorne*, 61 S.W.3d at 444; *see also Surko Enters., Inc. v. Borg–Warner Acceptance Corp.*, 782 S.W.2d 223, 225 (Tex.App.-Houston [1st Dist.] 1989, no pet.); *Ballenger v. Ballenger*, 694 S.W.2d 72, 76 (Tex.App.-Corpus Christi 1985, no writ). If TEN is permitted to foreclose on *all* of Southwest's assets, as it intends to do, the evidence suggests Southwest will become insolvent, judgment-proof, and as stated by the trial court, "an empty shell."

On this evidence, we conclude Westchase demonstrated irreparable injury and no adequate remedy at law. We overrule TEN's second point of error.

### D.  PARTY SUBJECT TO INJUNCTION

 In TEN's reply brief, it contends for the first time that the injunction is improper because TEN is not a party subject to injunction under UFTA. Section 24.008(a)(3) provides that a creditor may obtain "an injunction against further disposition by the debtor or a transferee, or both, of the asset transferred or other property." TEX. BUS. & COM.CODE ANN. § 24.008(a)(3)(A). TEN argues that unless it takes possession of Southwest's assets, it never becomes a "transferee" subject to an UFTA injunction. We disagree.

UFTA defines "transfer" to mean "every mode, direct or *indirect*, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or *an interest in an asset*, and includes payment of money, release, lease, and *creation of a lien or other encumbrance*." *Id.* § 24.002(12) (emphasis added). A lien in TEN's favor was created when, in complicity with Southwest, TEN acquired the lien against Southwest's property.[7] Under the facts presented here, TEN became a "transferee" when it became a lienholder of Southwest's assets.

TEN's contention stated in its reply brief is overruled.

### CONCLUSION

We affirm the trial court's order granting the temporary injunction.

---

7. We again note that TEN existed solely to acquire and hold Southwest's loans; that Charles Tharp was president and sole shareholder of both TEN and Southwest; and that Tharp provided the money used by TEN to pay off the Southwest loans in order to have the lien against Southwest's property acquired by TEN.