Opinion issued January 31, 2003












In The
Court of Appeals
For The
First District of Texas




NO. 01-02-00914-CV




MOHAMMED ATIQUE AHMED, Appellant




V.

SHIMI VENTURES, L.P. AND BELTWAY INSURANCE AGENCY, INC.,
Appellees




On Appeal from the 189th District Court
Harris County, Texas
Trial Court Cause No. 2002-40438




O P I N I O N

          Appellant, Mohammed Atique Ahmed, takes this interlocutory appeal from the
granting of a temporary injunction. See Tex. Civ. Prac. & Rem. Code Ann. §
51.014(a)(4) (Vernon Supp. 2003). We determine (1) whether the trial court could
enter, and whether we may review in this interlocutory appeal, a modified temporary
injunction order that was entered after Ahmed had appealed the original temporary
injunction order; (2) whether we must vacate the injunction in part because it requires
some acts violating the Insurance Code; and (3) whether the trial court abused its
discretion in determining that appellees, Beltway Insurance Agency, Inc. (“Beltway”)
and Shimi Ventures, L.P. (“Shimi”), carried their burden of showing a probable right
of recovery and irreparable injury. We modify the temporary injunction order in part,
to vacate certain of its provisions, and affirm it as so modified.
Background
          The following background facts come from evidence presented at the
temporary injunction hearing and from two affidavits, which the trial court considered
without objection, that were attached to Beltway and Shimi’s petition.



          Beltway incorporated in October 2000 and is the managing general partner of
Shimi, which was formed the same month. Shortly after Shimi’s formation, Shimi
purchased the assets, goodwill, and books of business of the Houston offices of Amco
Insurance Agencies, Inc. (“Amco”).
          The undisputed evidence shows that, through the date of the temporary
injunction hearing, Beltway had never been licensed as an insurance agency by the
Texas Department of Insurance, even though Beltway’s petition admitted that, since
the purchase of Amco’s business, Beltway had been “in the business of selling Texas
personal automobile liability insurance.” In contrast, Ahmed—originally the
president, board member, employee, and shareholder of Beltway and also a limited
partner in Shimi—had been a licensed, limited lines agent since 1999. There was
testimony that Beltway had wanted Ahmed to get an insurance license in Beltway’s
name and that Ahmed could have obtained that license in as few as six weeks.
          Starting sometime in late 2000, Ahmed began entering into producer
agreements in his own name with insurers or their agents with whom Beltway did
business. Ahmed received commission checks pursuant to these agreements. 
Through July 23, 2002, when he left Beltway, Ahmed endorsed his commission
checks earned under any of these producer agreements to Beltway and deposited them
in Beltway’s account.
          Ahmed signed one such producer agreement in early 2002 with Logic
Underwriters, Inc. (“Logic”), an insurance agency with which Beltway did business. 
As with his other producer agreements, Ahmed signed the agreement in his own
name, not expressly as agent of Beltway. Logic generally issued commission checks
either in Ahmed’s name or jointly in his and Beltway’s name, showing Beltway’s
address under the payee line.


 However, Logic mailed these checks to the addresses
of Ahmed’s personal stores, not to Beltway’s address. Following the usual procedure,
Ahmed endorsed the Logic commission checks to Beltway.
          On July 23, 2002, Beltway’s shareholders and board members met and
removed Ahmed as a board member, president, and employee of Beltway. The board
removed Ahmed because he had not obtained the licenses required for Beltway to act
as a limited lines agency. According to Beltway and Shimi’s evidence, Ahmed
promised at that meeting not to interfere with Beltway’s operations or relations with
insurers after his removal. Nonetheless, Ahmed thereafter instructed Logic to issue
commission checks solely in his name and to send them to him.
          This dispute concerns who is entitled to the commission checks issued after
Ahmed’s removal for insurance policies that Ahmed wrote before his removal. In a
nutshell, the parties dispute the capacity in which Ahmed acted under the producer
agreements and, thus, the ownership of his commissions. Ahmed testified that he
entered into the producer agreements on his own behalf, not as Beltway’s agent; that
the commissions earned pursuant to his producer agreements were his alone; and that
the commission checks that he endorsed to Beltway were loans, although he admitted
that no loan documents existed. Beltway and Shimi presented evidence that Ahmed
acted as Beltway’s agent under the producer agreements through July 23, 2002; that
Ahmed knew that the commissions he earned on policies written before that date
belonged to Beltway; and that no loan existed.
          Shimi and Beltway sued Ahmed for fraud and conversion, seeking a temporary
restraining order (“TRO”) and temporary and permanent injunctions and damages.


 
The ancillary judge granted an ex parte TRO that restrained Ahmed, his wife, and
those acting for or with them from “directly or indirectly removing, transferring,
wiring, spending, investing, secreting, or . . . disposing” of funds belonging to
Beltway and Shimi, whether from Logic or otherwise. The TRO also restrained the
same people from contacting any insurers with whom Beltway and Shimi conducted
business.
 
          Ahmed answered, seeking to dissolve the TRO, counter-claiming for contract
breach and conversion, and seeking a TRO and temporary and permanent injunctions
against Beltway and Shimi. On August 19, 2002, the trial court held an evidentiary
hearing on the applications for temporary injunction. The trial court orally granted
Beltway and Shimi’s application and denied Ahmed’s.


 On August 23 2002, the trial
court signed a temporary injunction order, which provided in pertinent part as
follows:
IT IS THEREFORE ORDERED that Mohammed Atique Ahmed
and all persons acting on behalf of or in concert with him, and all
persons with actual notice of this Order, are temporarily enjoined from
directly or indirectly removing, transferring, wiring, spending, investing,
secreting, or in any manner whatsoever disposing of the commissions
from Logic Underwriters, Inc. or the commissions paid by any insurer,
or any other funds that belong to [Shimi] or [Beltway].
 
IT IS FURTHER ORDERED that Mohammed Atique Ahmed
shall remit to [Beltway] the proceeds from all commission checks that
have been deposited to accounts under his control for commissions
earned on policies written through July 23, 2002 (approx. $47,325.00)
from Logic Underwriters, Inc. or paid by any insurer with whom [Shimi]
or [Beltway] conduct business and shall deliver such proceeds to [Shimi
and Beltway’s] counsel . . . .
 
IT IS FURTHER ORDERED that Mohammed Atique Ahmed
shall deliver to [Shimi and Beltway’s] counsel a photocopy of each
commission check that has been deposited to accounts under his control
for commissions earned on policies written through July 23, 2002 from
Logic Underwriters, Inc. or paid by any insurer with whom [Shimi] or
[Beltway] conduct business and shall deliver such photocopies to [Shimi
and Beltway’s] counsel . . . .
 
IT IS FURTHER ORDERED that Mohammed Atique Ahmed
shall endorse and make payable to the order of [Beltway] all checks
from Logic Underwriters, Inc. or paid by any insurer with whom [Shimi]
or [Beltway] conduct business for commissions earned on policies
written through July 23, 2002 and shall deliver within forty-eight (48)
hours after his receipt of all such checks to [Shimi and Beltway’s]
counsel.
 
IT IS FURTHER ORDERED that [Shimi and Beltway] and
Mohammed Atique Ahmed shall photocopy each commission check that
comes into their respective possession for commissions earned on
policies written through July 23, 2002 from Logic Underwriters, Inc. or
any other insurer with whom [Shimi] or [Beltway] conduct business and
shall make such photocopies available to opposing counsel upon
request.
 
IT IS FURTHER ORDERED that Mohammed Atique Ahmed, his
family members, agents, servants, employees, attorneys and all other
persons or entities in active concert or participation with him are
enjoined from directly or indirectly contacting Logic Underwriters, Inc.
or any insurer with whom [Shimi] or [Beltway] conduct business for any
purpose related to insurance policies written or commissions earned on
insurance policies written through July 23, 2002 and claiming that they
represent the interests of [Shimi and Beltway].

(Emphasis added.)

          Ahmed appealed the temporary injunction order three days later. He then left
the country, reportedly to visit a sick family member. In September 2002, Beltway
and Shimi moved to modify the temporary injunction order because Ahmed had
allegedly failed to remit the commissions that he had already deposited (about
$47,000), to endorse further commission checks to Beltway, and to provide Beltway
and Shimi with copies of further commission checks. Beltway and Shimi claimed
that Ahmed had not returned to the country. After holding a non-evidentiary hearing
on the modification motion, the trial court entered a modified temporary injunction
order, which was substantively similar to the first order except that it lowered Shimi
and Beltway’s bond and also ordered all insurers doing business with Shimi or
Beltway to reissue any commission checks issued to Ahmed or Ahmed and Beltway
jointly since August 2002, making them payable solely to Beltway, and to make all
future commissions checks on policies written through July 23, 2002 payable solely
to Beltway.
Effect of Temporary Injunction’s Modification After Perfection of Appeal
          While this interlocutory appeal was pending, and after Ahmed had filed his
brief, the trial court entered an order modifying the appealed temporary injunction
order. Citing Rule of Appellate Procedure 29.6, Ahmed has moved this Court to
review the modified temporary injunction order in this appeal. See Tex. R. App. P.
29.6.
          The second temporary injunction order was entitled “order modifying
temporary injunction,” not “amended order,” and it did not expressly vacate the first
order. However, other than adding a provision applicable to insurers, reducing
Beltway and Shimi’s bond, and changing some compliance dates, the modified order
was identical to the first order. Moreover, the modified order concerned exactly what
the earlier order had, and it did not incorporate by reference any terms from the first
order or state that it merely supplemented the first order—that is, the second order
was a complete temporary injunction in itself concerning exactly the same subject
matter. The modified order thus implicitly superseded the earlier order.


 Cf.
Anderson v. Teco Pipeline Co., 985 S.W.2d 559, 562 (Tex. App.—San Antonio 1998,
pet. denied) (holding that later judgment, styled “amended final judgment,” implicitly
vacated earlier judgment, styled “final judgment”). 
          Neither party questions whether we may consider the modified order in an
interlocutory appeal from the superseded order, or whether the modified order is void
in whole or in part, or whether the interlocutory appeal is somehow moot because it
was taken from a now-superseded injunction order. We note, however, that these
questions concern either our own jurisdiction over this appeal, which we must
consider even if the parties do not,


 or the trial court’s jurisdiction to modify its
injunction, which will affect which order we review, a matter we must decide anyway
to review Ahmed’s issues. Accordingly, we examine the effect of the modified order.
A.      Our Jurisdiction Over the Modified Temporary Injunction Order
          Rule of Appellate Procedure 29.6 governs our jurisdiction to review, in an
interlocutory appeal, a trial court order entered after the appeal’s perfection:
While an appeal from an interlocutory order is pending, on a party’s
motion or on the appellate court’s own initiative, the appellate court may
review the following: (1) a further appealable interlocutory order
concerning the same subject matter; and (2) any interlocutory order that
interferes with or impairs the effectiveness of the relief sought or that
may be granted on appeal.

Tex. R. App. P. 29.6(a) (emphasis added).
          The modified temporary injunction order clearly “concern[s] the same subject
matter” as the earlier order that was appealed. See Tex. R. App. P. 29.6(a)(1). 
Therefore, we may review the modified order in this interlocutory appeal as long as
it is itself an “appealable interlocutory order.”


 See id.
 
          Generally, we have jurisdiction to hear an appeal from an interlocutory order
only if a statute explicitly makes the order appealable. See Stary v. DeBord, 967
S.W.2d 352, 352-53 (Tex. 1998). “A person may appeal from an interlocutory order
of a district court . . . that: . . . grants or refuses a temporary injunction or grants or
overrules a motion to dissolve a temporary injunction as provided by Chapter 65.”


 
Tex. Civ. Prac. & Rem. Code Ann. § 51.014(a)(4) (Vernon Supp. 2003). 
          We must strictly construe section 51.014’s grant of interlocutory jurisdiction
because the Legislature intended it to be a narrow exception to the general rule that
only final judgments are appealable. See Bally Total Fitness Corp. v. Jackson, 53
S.W.3d 352, 355 (Tex. 2001); Baylor Coll. of Med. v. Tate, 77 S.W.3d 467, 469-70
(Tex. App.—Houston [1st Dist.] 2002, no writ). An order modifying a temporary
injunction order is not exactly an order that “grants or refuses a temporary injunction
or grants or overrules a motion to dissolve a temporary injunction.” See Tex. Civ.
Prac. & Rem. Code Ann. § 51.014(a)(4). Nonetheless, this Court has construed
section 51.014(a)(4) to grant interlocutory review of an order modifying a temporary
injunction, given the similarity of that order to the orders listed in section
51.014(a)(4). See Toby Martin Oilfield Trucking, Inc. v. Martin, 640 S.W.2d 352,
354-55 (Tex. App.—Houston [1st Dist.] 1982, no writ).


 Allowing an interlocutory
appeal of such an order is especially appropriate when, as here, the modified order
implicitly vacates and then replaces the original one: that situation is very much like
a dissolution, followed by a granting, over both of which rulings section 51.014(a)(4)
expressly allows an interlocutory appeal. See Tex. Civ. Prac. & Rem. Code Ann. 
§ 51.014(a)(4).
          Consistent with Martin, we hold that we have jurisdiction to review an order
modifying a temporary injunction by interlocutory appeal. See Martin, 640 S.W.2d
at 354-55; see also Currie v. Int’l Telecharge, Inc., 722 S.W.2d 471, 472-73 (Tex.
App.—Dallas 1986, no writ). Accordingly, we further hold that we have jurisdiction
to review the modified temporary injunction order in this interlocutory appeal from
the now-superseded temporary injunction order. See Tex. R. App. P. 29.6(a)(1).
          We grant Ahmed’s motion to review the modified temporary injunction order. 
See id.
B.      The Trial Court’s Jurisdiction to Enter the Modified Temporary
Injunction Order

          That does not end our inquiry. Our holding that we may review the modified
temporary injunction order in this interlocutory appeal is not the same as holding that
the modified order itself is valid. 
          The modified order is valid if the trial court had jurisdiction to enter it during
the interlocutory appeal. Rule of Appellate Procedure 29.5 sets out the trial court’s
jurisdiction after an interlocutory appeal is filed. See Tex. R. App. P. 29.5. Rule 29.5
provides that, during the pendency of an interlocutory appeal, the trial court retains
subject-matter jurisdiction of the case and may make “further orders, including one
dissolving the order appealed from, and if permitted by law, may proceed with a trial
on the merits.” Id.


 The rule expressly prohibits the trial court from making an order
that is inconsistent with any temporary orders of the appellate court or that “interferes
with or impairs” the appellate court’s jurisdiction or the effectiveness of the relief that
a party seeks or that the appellate court may grant. Tex. R. App. P. 29.5(a), (b). 
          We have already held that we have interlocutory jurisdiction to review the
modified order under statute and rule; therefore, the fact that the modified order
implicitly supplanted the earlier, appealed order does not in itself interfere with our
interlocutory jurisdiction in violation of rule 29.5. Additionally, to the extent that the
modified order’s content does not materially differ from that of the superseded order,
the modified order neither prevents our review of Ahmed’s issues nor affects the
relief that he requests or that we could grant him. Finally, we note that the modified
temporary injunction order’s additional provisions do not adversely affect the relief
that Ahmed requests or that we could grant him. Compare, e.g., McAllen Med. Ctr.,
Inc. v. Cortez, 66 S.W.3d 227, 238 (Tex. 2001) (holding that severance order, entered
after defendant appealed class-action certification, violated rule 29.5(b) because it
severed out what had been the class-action claims against appealing defendant and
because, although appellant could have intervened in severed suit, deadline for
appealing class-certification order in that suit had already expired). Therefore, under
the plain language of rule 29.5, the trial court had jurisdiction to enter the modified
temporary injunction order. 
          There is case law that appears to be contrary, but because of amendments to the
applicable rules, it does not control. For example, at common law, before the
Supreme Court adopted the predecessor to these rules, some courts had held that the
interlocutory appeal of an order deprived the trial court of jurisdiction over the
subject matter of the appealed order, so that all subsequent trial court orders on the
same subject were void. See Parsons v. Galveston County Employees Credit Union,
576 S.W.2d 99, 100 (Tex. Civ. App.—Houston [1st Dist.] 1978, order granting stay)
(in vacating amended order entered after interlocutory appeal taken, holding, “The
perfection of an appeal from an order granting a temporary injunction terminates the
jurisdiction of the trial court insofar as the temporary injunction is concerned.”).


 
Under the pre-rules common law, the modified temporary injunction order here would
have been void, and only the original temporary injunction order would have
remained in effect. See Humble Exploration Co. v. Fairway Land Co., 641 S.W.2d
934, 940 (Tex. App.—Dallas 1982, writ ref’d n.r.e.) (considering merits of original
receivership order on interlocutory appeal, while vacating order modifying
receivership after appeal for lack of jurisdiction in trial court). 
          But the Supreme Court’s adoption of Rule of Civil Procedure 385b in 1983,
and its adoption of substantively similar Rule of Appellate Procedure 43(d) in 1986,
changed that common law rule. See Tex. R. Civ. P. 385b(d), Order of the Supreme
Court, Adopting Rules of Civil Procedure (Dec. 5, 1983, eff. Apr. 1, 1984), Texas
Cases, 661-62 S.W.2d XXIX, XCIII (West 1984), superseded by Tex. R. App. P.
43(d), Order of the Supreme Court and the Texas Court of Criminal Appeals,
Promulgating New Rules of Appellate Procedure (Apr. 10, 1986, eff. Sept. 1, 1986,
superseded eff. Sept. 1, 1997), Texas Cases, 707-08 S.W.2d XXIX, LV (West 1986). 
Former rules 385b(d) and 43(d) provided that the trial court retained jurisdiction to
“issue further orders, including dissolution of the order appealed from,” but expressly
prohibited orders “granting substantially the same relief as that granted by the order
appealed from,” those contrary to temporary appellate orders, or those interfering
with or impairing the effectiveness of relief on appeal. See id. Under either former
rule 385b(d) or former rule 43(d), the modified order would have been void for
granting substantially the same relief as the original order, and we would have
reviewed only the original temporary injunction order. See St. Louis S.W. Ry. Co. v.
Voluntary Purchasing Groups, Inc., 929 S.W.2d 25, 33 (Tex. App.—Texarkana 1996,
no writ); Cobb v. Thurmond, 899 SW.2d 18, 19 (Tex. App.—San Antonio 1995, writ
denied); Hopper v. Safeguard Bus. Sys., Inc., 787 S.W.2d 624, 626-27 (Tex.
App.—San Antonio 1990, no writ). 
          Once again, however, the Supreme Court substantively amended the rules in
1997 by adopting rule 29.5, quoted above. See Order of the Supreme Court and the
Texas Court of Criminal Appeals, Final Approval of Revisions to the Texas Rules of
Appellate Procedure (Aug. 15, 1997, eff. Sept. 1, 1997), Texas Cases, 948-49
S.W.2d LXI, C (West 1997). Importantly, the revision omitted the prohibition against
entering an order granting substantially the same relief as that granted by the appealed
order—which change was made, according to the comments, because the former
prohibition was too broad. See Tex. R. App. P. 29.5 & cmt. Therefore, the case law
interpreting the “substantially similar” prohibition of former rules 43(d) and 385b(d)
is not binding under rule 29.5. Neither is the pre-rules common law prohibition
against any further orders viable under rule 29.5.



          We hold that the trial court had jurisdiction to enter the modified temporary
injunction order. See Tex. R. App. P. 29.6. We also hold that we may review that
modified order in this interlocutory appeal. See Tex. R. App. P. 29.5.
The Merits of the Modified Temporary Injunction Order
A.      Standard of Review and Burden of Proof
          A temporary injunction’s purpose is to preserve the status quo of the
litigation’s subject matter pending trial. Butnaru v. Ford Motor Co., 84 S.W.3d 198,
204 (Tex. 2002). We may not review the merits of the applicant’s case in an
interlocutory appeal from a temporary injunction order. Tel. Equip. Network, Inc. v.
TA/Westchase Place, Ltd., 80 S.W.3d 601, 607 (Tex. App.—Houston [1st Dist.] 2002,
no pet.).
          To obtain a temporary injunction, an applicant must plead and prove (1) a
cause of action against the defendant, (2) a probable right to the relief sought, and (3)
a probable, imminent, and irreparable injury in the interim. Butnaru, 84 S.W.3d at
204. In establishing a probable right to the relief sought, the applicant need not
establish that it will prevail at trial. See City of Friendswood v. Registered Nurse
Care Home, 965 S.W.2d 705, 707 (Tex. App.—Houston [1st Dist.] 1998, no pet.). 
To establish an irreparable injury, the injured applicant must show that it “cannot be
adequately compensated in damages or . . . the damages cannot be measured by any
certain pecuniary standard.” Butnaru, 84 S.W.3d at 204. That is, the applicant must
establish that there is no adequate remedy at law for damages. See Surko Enters., Inc.
v. Borg-Warner Acceptance Corp., 782 S.W.2d 223, 225 (Tex. App.—Houston [1st
Dist.] 1989, no writ). An adequate remedy at law is one that is as complete, practical,
and efficient to the ends of justice and its prompt administration as is equitable relief. 
Id.
          Whether to grant a temporary injunction lies within the trial court’s sound
discretion. Tel. Equip. Network, 80 S.W.3d at 607. We will thus not reverse the trial
court’s order unless the trial court’s action was “so arbitrary that it exceeded the
bounds of reasonable discretion.” Id. One way that a trial court abuses its discretion
is to apply the law erroneously to undisputed facts. Id. A trial court also abuses its
discretion when it issues an injunction that orders an illegal act, even when done in
the name of preserving the status quo. See Registered Nurse Care Home, 965 S.W.2d
at 708 (vacating temporary injunction order granted in favor of plaintiffs/appellees
because trial court abused discretion by issuing injunction that preserved status quo
by allowing plaintiffs to continue operating facilities under conditions violating law);
see also DeNoie v. Bd. of Regents of Univ. of Tex. Sys., 609 S.W.2d 601, 603 (Tex.
Civ. App.—Austin 1980, no writ) (“Status quo can never be a course of conduct
which is a prima facie violation of law.”). We view the evidence in the light most
favorable to the trial court’s order, indulging every reasonable inference in its favor. 
Amalgamated Acme Affiliates, Inc. v. Minton, 33 S.W.3d 387, 392 (Tex.
App.—Austin 2000, no pet.); Tel. Equip. Network, 80 S.W.3d at 607.
B.      Violation of Law
          1.       Whether the Modified Temporary Injunction Order Requires Acts
Violating Statute

          In issue four, Ahmed argues that the modified temporary injunction order is
void to the extent that it compels him and third parties to violate the Insurance Code.
          The Insurance Code prohibits an insurer or insurance agent engaged in the
business of insurance in Texas from “pay[ing], directly or indirectly, . . . any
commission or other valuable consideration to . . . any person for services performed
by that person as an insurance agent in this state” unless the person holds an
insurance license. Tex. Ins. Code Ann. art. 21.01-2, § 2A(b) (Vernon Supp. 2003).


 
The Insurance Code also prohibits “any person to act, as an agent or otherwise, in
soliciting or receiving applications for insurance of any kind whatever” in Texas and
from “in any manner” aiding “in the transaction of the business of any insurance
company” without first procuring a license or certificate of authority . . . .” Tex. Ins.
Code Ann. art. 21.01, § 2 (Vernon Supp. 2003).


 The Code defines an “agent” as
[a]ny person who solicits insurance on behalf of any insurance company,
. . . or who takes or transmits other than for himself any application for
insurance or any policy of insurance to or from such company, . . . or
who shall receive or deliver a policy of insurance of any such company,
or who shall . . . receive, or collect, or transmit any premium of
insurance, . . . or do or perform any other act or thing in the making or
consummating of any contract of insurance for or with any such
insurance company other than for himself, . . . whether any of such acts
shall be done at the instance or request, or by the employment of such
insurance company, or of, or by, any broker or other person . . . .

Tex. Ins. Code Ann. art. 21.02, § (a) (Vernon Supp. 2003).




          The quoted prohibitions apply to persons licensed as, among other things,
property and casualty insurance agents. See Tex. Ins. Code Ann. art. 21.01, § 3(16)
(Vernon Supp. 2003). The undisputed evidence showed that Ahmed was at all
pertinent times such an agent, specifically, a licensed limited lines agent for
automobile insurance. 
          The Insurance Code defines “person” for purposes of the above-quoted statutes
to include corporations and partnerships. See Tex. Ins. Code Ann. art. 21.07, §
1A(8) (Vernon Supp. 2003).


 The Code further defines a “corporation” to be “a legal
entity that is organized under the business corporations laws or limited liability
company laws of this state, another state, or a territory of the United States and that
has as one of its purposes the authority to act as an insurance agent.” Tex. Ins. Code
Ann. art. 21.07, § 1A(3) (Vernon Supp. 2003). It was undisputed that Beltway was
a Texas corporation and that, through the time of the temporary injunction hearing,
Beltway was not a licensed insurance agency. Therefore, the statutes prohibiting
commission-sharing and insurance solicitation applied to Beltway to the extent that
it wrote insurance policies or otherwise acted as an insurance agent, which Beltway
admitted here and below that it did.
          The modified temporary injunction order requires Ahmed, a licensed insurance
agent, to remit his commissions and to endorse his commission checks to Beltway,
a corporation that is not a licensed insurance agency. The order also requires third-party insurers or their managing agents to make commission payments directly to
Beltway, which again is unlicensed. The Insurance Code clearly prohibits such
actions. The modified temporary injunction order thus requires illegal acts, even if
the trial court merely intended to keep the status quo by ordering them.


 See
Registered Nurse Care Home, 965 S.W.2d at 708.
          Beltway and Shimi do not argue that an unlicensed corporation performing
insurance agent services can legally share a licensed agent’s commissions. Rather,
they respond that they never contracted to share Ahmed’s commissions, but sought
merely to preserve by the injunction the amount of revenues that would have flowed
to Beltway had Ahmed obtained Beltway’s license. That is, the protected funds
represent the damages that Beltway and Shimi hope to collect under their fraud claim. 
However, that theory of the injunction’s purpose has nothing to do with the fact that
the mechanism that the injunction uses to carry out that purpose requires licensed
agents and insurers to pay commissions directly to an unlicensed corporation
performing insurance services, contrary to the law. 
          Accordingly, we must vacate those portions of the modified temporary
injunction order that require Ahmed’s commissions to be paid, directly or indirectly,
to Beltway. See Registered Nurse Care Home, 965 S.W.2d at 708. We thus sustain
issue four.



          2.       Whether Beltway and Shimi Showed a Probable Right of Recovery

          In issue one, Ahmed argues that Beltway and Shimi did not establish a
probable right of recovery on their conversion or fraud claims because those claims
were allegedly based on Ahmed’s payment of commissions to them, an act that we
have held would violate the Insurance Code. With respect to the fraud claim, Ahmed
also argues that there was no evidence that he misrepresented anything.
          Courts have long refused to enforce contracts that called for paying or sharing
insurance commissions in violation of the Insurance Code provisions discussed
above. See Benefits Admin. Corp. v. Rearick, 705 S.W.2d 234, 235-36 (Tex.
App.—Texarkana 1986, no writ); Perkins v. Lambert, 325 S.W.2d 436, 440 (Tex.
Civ. App.—Austin 1959, writ dism’d); Stone v. Sterling Mut. Life Ins. Co., 127
S.W.2d 345, 347-48 (Tex. Civ. App.—Galveston 1939, no writ); Employers Cas. Co.
v. Mitchell, Gartner & Walton, 84 S.W.2d 862, 864 (Tex. Civ. App.—Fort Worth
1935, no writ); see also Ins. Co. of N. Am. v. Morris, 981 S.W.2d 667, 681-82 (Tex.
1998); Tidelands Life Ins. Co. v. Armstrong, 414 S.W.2d 196, 198 (Tex. Civ.
App.—Austin 1967, no writ). Ahmed relies on this line of cases. However, Ahmed
overlooks that at least one cause of action that Beltway and Shimi pled—that for
fraud—does not seek to enforce an agreement to share commissions. To the contrary,
as Beltway and Shimi explain on appeal, that cause of action assumes that Beltway
could not legally share Ahmed’s commissions. Instead, the cause of action relies on
their allegation that Ahmed did not obtain Beltway’s license after having been
charged with doing so specifically so that he could keep the commissions from
Beltway, allegedly contrary to the parties’ arrangement.


 That theory of recovery is
not based on enforcement of an illegal arrangement to share commissions. 
          Fraud requires “‘a material misrepresentation, which was false, and which was
either known to be false when made or was asserted without knowledge of its truth,
which was intended to be acted upon, which was relied upon, and which caused
injury.’” Formosa Plastics Corp. USA v. Presidio Engs. & Contractors, Inc., 960
S.W.2d 41, 47-48 (Tex. 1998) (quoting Sears, Roebuck & Co. v. Meadows, 877
S.W.2d 281, 282 (Tex. 1994)). Ahmed relies on Armstrong v. Tidelands Life
Insurance Co. to argue that no reliance existed as a matter of law. 466 S.W.2d 407
(Tex. Civ. App.—Corpus Christi 1971, no writ). The Armstrong court considered,
among other things, summary judgments in favor of the defendant insurer on the
contract-breach and fraud claims of an insurance agent. See id. at 408. The agent
based his fraud claim on the insurer’s having misrepresented that it would obtain the
proper license for him to act as an agent. See id. The damages that the agent sought
were the commissions that he would have received had the insurer obtained the
license. See id. at 409. After holding that the contract between the agent and the
insurer was void and unenforceable because the agent was not properly licensed, the
Armstrong court affirmed the summary judgment rendered on the fraud claim. See
id. The court noted that the statute placed the responsibility on the agent to obtain the
license before acting as an insurance agent. See id. Based on this statutory
requirement, the Armstrong court held that the agent could not rely on the insurer’s
promise to get a license for him. See id. at 409-10, 411.
          We distinguish Armstrong for two reasons. First, in Armstrong, it was the
insurance agent who performed the services requiring a license, yet he relied on
another entity first to obtain that license for him. Put another way, one party took
responsibility for obtaining the insurance agent’s license, while the other party took
responsibility for acting as the insurance agent. Under that arrangement, the
individual began acting as an insurance agent without having first confirmed that the
insurer, a separate entity, had gotten the license that was a prerequisite to the
individual’s acting. Here, in contrast, viewed in the appropriate light and indulging
all reasonable inferences in Beltway and Shimi’s favor, one party (Ahmed) took
responsibility both for obtaining the license, which the evidence shows might have
been done quickly, and for earning the disputed commissions. Ahmed determined
both when Beltway would be licensed and when he would start earning commissions
on Beltway’s behalf. The individual in Armstrong could not rely on another to obtain
his license before acting as an agent, which arrangement might (and did) end up
violating the statute; in contrast, nothing prevented Ahmed from procuring a license
for his corporation before acting as an agent. 
 
          Second, the individual in Armstrong relied on a separate entity to obtain his
license. In contrast, viewed in the right light, Ahmed, as Beltway’s president, was
acting as Beltway’s officer and employee for the purpose of obtaining Beltway’s
license. This means that Beltway (through its corporate representative, Ahmed) was
itself taking responsibility for getting its own license before allowing Ahmed (as its
employee) to earn commissions. The fact that Ahmed never got that license might
show that Ahmed failed his corporate principal, but it does not necessarily
demonstrate that Beltway was not entitled to rely on him as its own corporate officer. 
Therefore, Armstrong does not as a matter of law defeat the reliance needed for
Beltway and Shimi’s fraud claim.
          Ahmed also argues that the trial court abused its discretion because there was
no evidence that Ahmed had misrepresented anything. However, there was evidence
that Ahmed had been charged with obtaining a license for Beltway and that he could
have done so in as few as six weeks, but that he did not. The law prevented
unlicensed Beltway from sharing Ahmed’s commissions, yet Beltway still collected
commissions. Additionally, Beltway did not remove Ahmed for failure to obtain
Beltway’s license until mid-2002, close to two years after he earned his first
commissions. Viewed in the required light, these facts raise reasonable inferences
that Ahmed hid his failure to get the license and that Beltway relied on that
misrepresentation.
          Accordingly, we hold that the trial court did not abuse its discretion if it
concluded that Beltway and Shimi showed a probable right of recovery on at least
their fraud cause of action.
          We overrule issue one.



C.      Irreparable Injury
          In issue two, Ahmed argues that Beltway and Shimi presented no evidence that
injury was imminent or irreparable or that Beltway and Shimi had no adequate legal
remedy absent the temporary injunction.
          The modified temporary injunction order recited that Ahmed’s possession of
commission checks would irreparably harm Beltway and Shimi by making them
experience “an immediate, and if not addressed, ongoing, shortfall in operating
revenues resulting in disruption of business operations, including the inability to
provide insurance services to its customers.” The order also recited that Beltway and
Shimi had no adequate remedy at law to compensate them for these damages.
 
          We hold that evidence supported the trial court’s determination on both
grounds. Regarding irreparable harm, Ahmed testified that, through July 23,
2002—that is, for over 20 months—he had deposited all his commission checks into
Beltway’s account. Ahmed testified that he had loaned these sums to Beltway to pay
for Beltway’s operating expenses: “I was trying to keep the money [sic] afloat. 
Without my loaning this money, the company would have gone under and the
investment my partners would have [sic] made would have physically vanished.” 
(Emphasis added.) The temporary injunction hearing was held only 29 days after
Ahmed had left Beltway and stopped depositing commissions into Beltway’s account. 
Given Ahmed’s own testimony that Beltway had depended on these sums for survival
for almost two years, the trial court could reasonably have inferred that Beltway’s
needs had not changed substantially in 29 days.
          Moreover, there was evidence from which the trial court could reasonably have
concluded that Beltway and Shimi had no adequate remedy at law. Ahmed admitted
that, although he considered the commissions that he had earned since the beginning
to be his personal property, he had not paid any income taxes on them to date. 
Ahmed’s counterclaim alleged that the amount of commissions he had loaned to
Beltway was $1,500,000 over the 22 months preceding the suit’s filing; he also
testified that, at least at the time of the hearing, his commissions were about $300,000
a year. One could thus reasonably infer that, under Ahmed’s theory of the case, he
could have potential, outstanding tax liability on a substantial income. Additionally,
Ahmed testified that he no longer had errors and omissions coverage for himself
individually, from which one could reasonably infer possible personal liability if
Ahmed were sued. Finally, two days after the original temporary injunction hearing,
Ahmed went to Pakistan. The next day, Ahmed’s counsel filed a motion to extend
the temporary injunction’s deadlines, which motion attached a family member’s
affidavit estimating that Ahmed would return from Pakistan in three weeks. 
However, as of the date of the injunction-modification hearing held about two months
later—and as was clear from counsels’ discussion at that second hearing—Ahmed
had not yet returned from Pakistan. The trial court thus knew of Ahmed’s continued
absence when it signed the modified temporary injunction order. That order carried
forth the same inadequate-remedy recital that had appeared in the original order.
          Based on this evidence, we hold that the trial court did not abuse its discretion
in concluding that Beltway and Shimi would suffer irreparable harm and had no
adequate remedy at law.
          We overrule issue two.
 
 
Conclusion
          We modify the modified temporary injunction order by vacating those portions
of that order that require Ahmed to relinquish or to sign over commissions to Beltway
or that require licensed insurers or their agents to pay commissions directly to
Beltway. We affirm the modified temporary injunction order as so modified.
 



                                                             Tim Taft
                                                             Justice
 
Panel consists of Justices Taft, Keyes, and Higley.