TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN




NO. 03-05-00479-CV




R & R Resources Corporation, Appellant


v.


Echelon Oil and Gas, L.L.C.; Tex-El Oil and Gas, Inc.;

and BairTex Energy, Inc., Appellees





FROM THE DISTRICT COURT OF FAYETTE COUNTY, 155TH JUDICIAL DISTRICT

NO. 2005V-107, HONORABLE DAN R. BECK, JUDGE PRESIDING



M E M O R A N D U M O P I N I O N



 This is an accelerated appeal from an order granting a temporary injunction. R &
R Resources Corporation is the operator and a working interest (1)
 owner of three oil and gas
wells--the Ullrich, Goebel Brothers, and Toennis--located in Fayette County. Echelon Oil and
Gas, L.L.C., Tex-El Oil and Gas, Inc., and BairTex Energy, Inc. are also working interest
owners. R & R Resources appeals a temporary injunction entered against it that prevents it from
opposing the designation of Leexus Oil & Gas, L.L.P. as the new operator of the Ullrich and
Goebel Brothers wells. R & R Resources challenges the trial court's order as an abuse of
discretion, arguing that the order violated the rules of equity and that Echelon, Tex-El, and
BairTex did not demonstrate standing to seek injunctive relief, a probable right of recovery, or
irreparable injury. R & R Resources's reply brief added two issues: (i) that R & R Resources
was denied an opportunity to be heard at a subsequent status hearing on September 9, 2005, and
(ii) that the trial court's order was impermissibly speculative. Because we find that the trial
court did not abuse its discretion by granting the temporary injunction, we affirm the trial court's
order.


BACKGROUND


 Echelon, Tex-El, and BairTex are in the business of purchasing and selling
interests in oil and gas producing properties. As part of this business, Echelon, Tex-El, and
BairTex purchased certain working interests in the Ullrich, Goebel Brothers, and Toennis oil and
gas wells. (2) The parties operate the wells under two identical joint operating agreements, the 1989
American Association of Petroleum Landmen Form 610 Model Form Operating Agreements. 
These forms are agreements between oil and gas lease owners and interest holders for the
exploration and development of oil and gas within the "contract area" described in the
agreements. The agreements in this case designate R & R Resources as the "Operator," that
conducts, directs, and controls operations in the contract area. All other parties to the
agreements--Echelon, Tex-El, (3) and BairTex--are designated as "Non-Operators."


 The parties conducted business through their respective corporate presidents: 
Frederick Doutel, Jr. of R & R Resources, Roger Slayton of Tex-El, Randal Snider of Echelon,
and Warren Bair of BairTex. On November 14, 2003, after Slayton complained to Doutel about
R & R Resources's operations and accounting procedures concerning the wells, Doutel sent an e-mail offering to arrange for Slayton to "take over operations on [the] Goebel, Ullrich and/or
Toennis" wells "th[at] afternoon." Later that day, Doutel sent another e-mail to Slayton stating,
"Sorry, we'll do it December 1st. You will be the operator."

 Shortly afterward, Slayton sought to audit R & R Resources's books and
requested that, at the completion of the audit, the parties sign the Texas Railroad Commission's
P-4 forms that would change the operator to Echelon. (4) On November 24, 2003, Doutel wrote a
letter to Slayton, copied to Snider and Bair, stating that R & R Resources would convey
operations of the Ullrich and Toennis wells but would retain operation of the Goebel Brothers
well. His letter also stated that R & R Resources was "working up a letter agreement regarding
conditions for operator transfer," including a requirement that the new operator use particular
vendors. Tex-El, Echelon, and BairTex audited R & R Resources's books in December 2003,
but afterward Doutel did not sign the P-4 forms.

 Unsuccessful in its attempts to have R & R Resources transfer operation of the
wells, Echelon, Tex-El, and BairTex retained counsel. Their attorney wrote to Doutel on April
30, 2004, advising that his clients, who were "majority interest" owners in the three wells, had
voted to remove R & R Resources as operator for "good cause" pursuant to the joint operating
agreements' terms. The letter proceeded to list the ways in which R & R Resources had "failed
and refused to act as a reasonably prudent operator." Counsel's letter also demanded that R & R
Resources: (i) relinquish operation of the wells to a new operator to be designated by Echelon,
Tex-El, and BairTex, and (ii) pay a refund owed to them. Doutel's May 28 response letter
denied the request to relinquish operation of the wells and stated that he had instructed his
accountant to remit the funds due to Echelon, Tex-El, and BairTex within ten days. (5) Doutel's
response did not address the other allegations in counsel's letter. Bill Jaehne of Leexus Oil &
Gas also called Doutel to ask whether he would turn the operations over to Leexus, but Doutel
refused.

 Almost four months after sending its demand letter, Echelon, Tex-El, and BairTex
(collectively, the "Non-Operators") requested the Texas Railroad Commission's approval of
single-signature P-4 forms designating Leexus Oil & Gas, L.L.P. as the new operator of the three
wells. The request explained that, although R & R Resources had been removed as operator
under the terms of the joint operating agreements because of its "operational and/or billing
discrepancies," R & R Resources refused to cease operations and transfer the P-4s to another
operator. The Commission requested a response from R & R Resources in support of R & R
Resources's good faith claim to operate the leases. It noted that R & R Resources was not
required to refute Leexus's good faith claim but only to substantiate R & R Resources's own
good faith claim to operate the wells.

 On November 19, 2004, after R & R Resources responded with copies of the
wells' leases and operating agreements, the Commission informed the parties that "[w]hether
Leexus is entitled to become the designated operator of the subject leases appears to turn on the
question of whether the owners of a majority of the working interest in the leases had the right to
remove R & R Resources as operator." The Commission stated that it lacked jurisdiction to
construe the terms of the operating agreements, determine what constituted "good cause" for
removal under the agreements, and otherwise determine the parties' contractual rights. 
Accordingly, it deferred these determinations to the courts and declined to process the single-signature P-4s.

 The Non-Operators filed suit against R & R Resources on May 18, 2005, and
sought a temporary injunction. On July 1, 2005, after a two-day hearing held on June 15 and 17,
the trial court entered an order preventing R & R Resources from opposing the designation of
Leexus as the operator of the Ullrich Lease and Goebel Brothers Lease. (6) In summary, the order
enjoined R & R Resources from


$ refusing to join in the immediate execution and delivery of proper joint form P-4s
designating Leexus as the operator for and of the Ullrich Lease and Goebel Brothers Lease;


$ interfering, opposing, preventing or refusing to cooperate with Plaintiffs' and/or Leexus's
efforts to file and obtain approval from the Texas Railroad Commission of joint form P-4s
designating Leexus (for Commission purposes) as the operator of the Ullrich Lease and
Goebel Brothers Lease;


$ further operating or performing operations on the Ullrich Lease and Goebel Brothers Lease
following the Commission's approval of the joint form P-4s;


$ interfering, opposing, preventing or refusing to cooperate with Leexus's operation of the
Ullrich Lease and Goebel Brothers Lease, following the Commission's approval of the joint
form P-4s; and


$ refusing to deliver to Leexus--upon the Commission's approval of Leexus's joint form P-4
operator status for the Ullrich Lease and Goebel Brothers Lease--the well files, records,
data, and all other documentation relating to the previous operation of the leases or
necessary to continue the operation of the leases.



 The trial court entered findings of fact and conclusions of law concerning the
temporary injunction. When R & R Resources did not comply with the injunction, the Non-Operators sought this Court's emergency enforcement of the order pending resolution of R & R
Resources's interlocutory appeal. We granted the motion.

 After R & R Resources did not comply with our order enforcing the trial court's
temporary injunction, the Non-Operators filed a motion for contempt, and R & R Resources filed
a motion for reconsideration of our order based on an in camera inspection of documents that the
trial court was to begin on or about November 4, 2005. We have not received any order that the
court may have entered during or subsequent to the pretrial hearing on October 12, 2005. We
referred enforcement of this Court's order to the trial court for findings and recommendations
concerning R & R Resources's compliance with our order enforcing the trial court's order. See
Tex. R. App. P. 29.4(b); In re Sheshtawy, 154 S.W.3d 114, 124-125 (Tex. 2004). We have not
received the trial court's findings and recommendations. Jury trial is set for January 18, 2006, to
determine whether the Non-Operators are entitled to declaratory relief and damages for R & R
Resources's alleged breach of the joint operating agreements' terms governing the accounting
and operation of the wells.


 ANALYSIS


Standard of Review


 The purpose of a temporary injunction is to preserve the status quo of the
litigation's subject matter pending a trial on the merits. Butnaru v. Ford Motor Co., 84 S.W.3d
198, 204 (Tex. 2002). Injunctions may also issue when the status quo is not a condition of rest
but of action, because the condition of rest will inflict irreparable injury on the complainant. 
RP&R, Inc. v. Territo, 32 S.W.3d 396, 401 n.3 (Tex. App.--Houston [14th Dist.] 2000, no pet.). 
To obtain a temporary injunction, the applicant must plead and prove a cause of action against
the defendant, a probable right to the relief sought, and a probable, imminent, and irreparable
injury in the interim. Butnaru, 84 S.W.3d at 204.

 The decision to grant or deny a temporary injunction lies within the sound
discretion of the trial court, and we will not disturb that decision absent a clear abuse of
discretion. Id. at 204. This Court may neither substitute its judgment for that of the trial court
nor consider the merits of the underlying lawsuit; we consider only the validity of the order. 
Universal Health Servs., Inc. v. Thompson, 24 S.W.3d 574, 576 (Tex. App.--Austin 2000, no
pet.); see also Tom James of Dallas, Inc. v. Cobb, 109 S.W.3d 877, 884 (Tex. App.--Dallas
2003, no pet.). Viewing the evidence in the light most favorable to the trial court's order and
indulging every reasonable inference in its favor, we determine whether the order was so
arbitrary as to exceed the bounds of reasonable discretion. Universal Health Servs., 24 S.W.3d
at 576; Tom James of Dallas, 109 S.W.3d at 883. If the court heard conflicting evidence and the
record contains evidence that reasonably supports its decision, we will affirm the order. 
Universal Health Servs., 24 S.W.3d at 576; see also Davis v. Huey, 571 S.W.2d 859, 862 (Tex.
1978).

 In an interlocutory appeal such as this, a trial court may file findings of fact and
conclusions of law, but it is not required to do so. Tex. R. App. P. 28.1; Tom James of Dallas,
109 S.W.3d at 884. While findings and conclusions may be helpful in reviewing for an abuse of
discretion, they do not carry the same weight as findings made after a trial on the merits and are
not binding when we are reviewing a trial court's exercise of discretion. Tom James of Dallas,
109 S.W.3d at 884 (citing IKB Indus., Ltd. v. Pro-Line Corp., 938 S.W.2d 440, 442 (Tex. 1997);
Chrysler Corp. v. Blackmon, 841 S.W.2d 844, 852 (Tex. 1992)).


Standing


 In its first issue, R & R Resources contends that Echelon, Tex-El, and BairTex
lacked standing to request the temporary injunction because they lack any direct ownership in
the wells at issue. R & R Resources quotes language in the joint operating agreements that
permits removal of the operator "by the affirmative vote of Non-Operators owning a majority
interest." But the testimony at the temporary injunction hearing revealed that, although Echelon,
Tex-El, and BairTex sold portions of the working interests that they had purchased, they also
reserved portions of those oil and gas interests for themselves.

 Additionally, Slayton and Bair testified that Echelon, Tex-El, and BairTex owned
a majority of the working interest in the wells through participation or subscription agreements
with their respective investors that had delegated decision-making and voting authority over
their interests to Echelon, Tex-El, and BairTex. Slayton testified that Tex-El and its investors
own 20% of the working interest in the Ullrich well and 15% of the working interest in the
Goebel Brothers well. The parties, including R & R Resources, stipulated to the testimony
concerning BairTex's and Echelon's interests in the wells. (7) With regard to the Ullrich well, the
parties stipulated to the testimony that BairTex and its investors own 12.40% of the working
interest while Echelon and its investors own 36.20% of the working interest. The parties further
stipulated to the testimony that, with regard to the Goebel Brothers well, BairTex and its
investors own 10% of the working interest while Echelon and its investors own 37% of the
working interest. The parties also stipulated to the testimony that Echelon, Tex-El, and
BairTex--along with their investors who purchased a portion of the working
interests--collectively owned 69% of the total working interest in the Ullrich well and 62% of
the total working interest in the Goebel Brothers well.

 R & R Resources next contends that it had a statutory right to determine the
identities of Echelon's, Tex-El's, and BairTex's investors and obtain their opinions on the
lawsuit. See Tex. Nat. Res. Code Ann. § 91.141(b) (West 2001). Its understanding of section
91.141 of the natural resources code entitles "any stockholder, or shareholder, or royalty owner
in an oil well" to inspect the records of any owners and operators of oil and gas wells. But that
section of the code states that "[t]he books shall be kept open for inspection of the commission
or any accredited representative of the commission and any stockholder, shareholder, or royalty
owner in the business." Id. (emphasis added). This statute requires Echelon, Tex-El, and
BairTex each to keep its books open for its own stockholders, shareholders, and royalty interest
owners. R & R Resources does not cite any authority for its contention that the books must be
opened to "any stockholder, or shareholder, or royalty owner in an oil well," other than its
interpretation of excerpts from section 91.141 of the natural resources code. We do not find its
argument under section 91.141 persuasive.

 R & R Resources's reliance on a contractual right to disclosure under the joint
operating agreements is similarly misplaced. It asserts that paragraph V.B.2 of the joint
operating agreements entitles it to determine whether Echelon, Tex-El, and BairTex conducted a
valid vote or polling of their investors prior to removal of the operator. Paragraph V.B.2 of the
agreements states that the successor operator shall be selected by the affirmative vote of two or
more parties owning a majority interest. As previously noted, there was testimony at the hearing
that Echelon, Tex-El, and BairTex owned a majority of the working interest in the wells through
participation or subscription agreements with their respective investors and that each of these
agreements delegated decision-making and voting authority over their interests to Echelon, Tex-El, and BairTex.

 The trial court found that "Plaintiffs [Echelon, Tex-El, and BairTex] own or, by
virtue of written agreements with their respective investors, exclusively control (including all
voting and decision making rights) a majority of the working interest" in the Ullrich and Goebel
Brothers leases. The court further found that in April 2004, plaintiffs notified R & R Resources
of their affirmative vote to remove R & R Resources as operator of the three leases. Because
there was some evidence adduced at the hearing that Echelon, Tex-El, and BairTex have direct
ownership in the Ullrich and Goebel Brothers wells, that their interests combined with those of
their investors constituted a majority, and that they affirmatively voted to remove R & Resources
as operator, we do not find that the court abused its discretion in determining that Echelon, Tex-El, and BairTex had standing to request a temporary injunction. We overrule R & R Resources's
first issue.


Probable, Imminent, and Irreparable Injury


 In its second issue, R & R Resources argues that the trial court abused its
discretion in finding "irreparable injury" because Echelon, Tex-El, and BairTex did not establish
that they would sustain imminent, irreparable injury without the entry of a temporary injunction. 
R & R Resources also argues that the Non-Operators have an adequate legal remedy in the form
of a contractual suit for damages. Probable injury includes elements of imminent harm,
irreparable harm, and lack of an adequate remedy at law for damages. Telephone Equip.
Network, Inc. v. TA/Westchase Place, Ltd., 80 S.W.3d 601, 607 (Tex. App.--Houston [1st Dist.]
2002, no pet.). An injury is irreparable if the injured party cannot be adequately compensated in
damages or if the damages cannot be measured by any certain pecuniary standard. Butnaru, 84
S.W.3d at 204. An adequate legal remedy is one that is as complete, practical, and efficient to
the prompt administration of justice as is equitable relief. Universal Health Servs., 24 S.W.3d at
577.

 R & R Resources argues that the wells at issue have produced oil and gas in
paying quantities under its operatorship, that it has made proportional distributions of this
income each month, and that the audit of its financial records did not reveal any unpaid invoices,
pollution, loss of acreage, liens, or claims against the wells. But Echelon, Tex-El, and BairTex
introduced evidence that R & R Resources was billing them for expenses incurred at least two
months earlier, or expenses incurred in the same month as the billing, that their revenues were
reduced by the amount of these untimely billings, and that R & R Resources delayed paying the
expenses for several months despite its ability to pay them. There was evidence that the Goebel
Brothers refund was not paid until seventeen months after the well was drilled, $100,000 of the
Goebel Brothers well expenses were unpaid for ten months, revenue checks to some owners
were dated weeks before they were mailed, and the audit of R & R Resources raised questions
about whether certain bills were paid at all.

 Mark Jaehne of Leexus testified that, although he received checks for his override
interest from Doutel in three or four weeks from the time the check was "cut," Doutel was
further behind because Doutel's check represented payment for the preceding month's
production; it was not an advance payment. Jaehne explained that if Tex-On, an oil and gas
gatherer, typically wired payment to Doutel on the 20th, but Doutel did not write a check to the
interest owner until the 5th of the next month and did not mail it until three or four weeks after
the date on that check, the interest owner would not be paid for production until sixty to seventy-five days after Doutel received payment. Jaehne also testified that he had a conversation with
Tex-On about being paid directly, but Doutel would not allow Tex-On to make such direct
payments.

 Jaehne further testified that continual late payments may cause vendors to refuse
to extend credit, charge higher prices, or refuse to provide services. He testified that R & R
Resources's operational charges were excessive; that the price it received from the sale of
salvage was too low; that it failed to install continuous chemical treating systems, the lack of
which can corrode equipment and affect production; and that it failed to adequately determine
the need for replacement materials and equipment. Additionally, Snider testified that Leexus
could do a better job, had more experience, more personnel, and a better location.

 Slayton characterized Doutel's demeanor as,"I'm going to do it the way I'm
going to do it and you can like it or dislike it." Slayton also testified that an investor on the
Ullrich and Goebel Brothers wells resolved never to invest with Slayton again because the
"operational bills were too high," and that vendors complained about the way their bills had been
handled by R & R Resources. Doutel testified that he was "not concerned about what vendors
think."

 Ongoing and continuing harm resulting from an operator's refusal to relinquish
operations is at least one basis for finding irreparable injury in support of a temporary injunction. 
See Tri-Star Petroleum Co. v. Tipperary Corp., 101 S.W.3d 583, 591 (Tex. App.--El Paso 2003,
pet. denied). Moreover, Echelon, Tex-El, and BairTex made claims for cloud on title and injury
to real property, which do not require a showing that an adequate legal remedy is lacking to
support an award of injunctive relief. See Tex. Civ. Prac. & Rem. Code Ann. § 65.011(4)-(5)
(West 1997). The trial court's order found that Echelon, Tex-El, and BairTex would suffer
injury for which there was no adequate remedy at law, noting that R & R Resources's improper
accounting and operational practices




have caused and will continue to cause loss and/or delay of revenue; payment of
excessive and/or unnecessary lease/well expenses; late payment of lease/well
expenses; exposure to lease/well creditors for non or late payment; the loss,
interruption, and/or delay in production of valuable minerals; and the injury
and/or damage to the well bores and/or equipment and materials located on the
leases/wells.




The trial court also determined that the above damages would continue to occur so long as R &
R Resources was operating the lease and that Echelon, Tex-El, and BairTex and their respective
investors lacked an adequate legal remedy absent the issuance of the temporary injunction. The
trial court was within its discretion to make such determinations based on the evidence before it. 
Furthermore, the court could have issued the temporary injunction without finding a lack of
adequate legal remedy based on section 65.011 (4)-(5) of the Texas Civil Practice and Remedies
Code. See id.

 R & R Resources also argues that, although the operations for the three wells at
issue have been conducted under the terms of the joint operating agreements for the Ullrich and
Goebel Brothers wells, the court granted a temporary injunction as to only two of the three wells.
 Although the temporary injunction was inapplicable to the Toennis well, the record shows that,
of the three wells in the underlying suit, the Toennis is the only well that is not expressly covered
by a joint operating agreement. The court heard Benny Jaehne of Leexus testify that, because
the Toennis does not have any operating agreement, if R & R Resources did not want to pay
another bill it "would not be bound to anything." The trial court's findings state that, while the
parties did not execute a joint operating agreement for the Toennis lease, R & R Resources
argued without objection that the terms of the agreements for the Ullrich and Goebel Brothers
leases applied to the Toennis lease by implication. Indulging every reasonable inference in favor
of the court's order, we may infer that the trial court declined to include the Toennis well within
the temporary injunction because it is not expressly covered by either of the two joint operating
agreements. We overrule R & R Resources's second issue.

Probable Right to the Relief Sought


 In its third issue, R & R Resources urges that the trial court abused its discretion
in finding a "probable right of recovery" because Echelon, Tex-El, and BairTex did not obtain a
finding of R & R Resources's gross negligence, willful misconduct, material breach, or total
inability to perform. A probable right of success on the merits is shown by alleging a cause of
action and presenting evidence that tends to sustain it. Telephone Equip. Network, Inc., 80
S.W.3d at 607. The temporary injunction applicant is not required to establish that it will prevail
on final trial. Butnaru, 84 S.W.3d 198, 211.

 The relevant provisions in the joint operating agreements are found in the first
two sections of article V.B.:




1. Resignation or Removal of Operator: Operator may resign at any time by
giving written notice thereof to Non-Operators. If Operator terminates its
legal existence, no longer owns an interest hereunder in the Contract Area, or
is no longer capable of serving as Operator, Operator shall be deemed to
have resigned without any action by Non-Operators, except the selection of a
successor. Operator may be removed only for good cause by the affirmative
vote of Non-Operators owning a majority interest based on ownership as
shown on Exhibit "A" (8) remaining after excluding the voting interest of
Operator; such vote shall not be deemed effective until a written notice has
been delivered to the Operator by a Non-Operator detailing the alleged
default and Operator has failed to cure the default within thirty (30) days
from its receipt of the notice or, if the default concerns an operation then
being conducted, within forty-eight (48) hours of its receipt of the notice. 
For purposes hereof, "good cause" shall mean not only gross negligence or
willful misconduct but also the material breach of or inability to perform its
obligations under this agreement.


Subject to Article VII.D.1, (9) such resignation or removal shall not become
effective until 7:00 o'clock A.M. on the first day of the calendar month
following the expiration of ninety (90) days after the giving of notice of
resignation by Operator or action by the Non-Operators to remove Operator,
unless a successor Operator has been selected and assumes the duties of
Operator at an earlier date. Operator, after effective date of resignation or
removal, shall be bound by the terms hereof as a Non-Operator. A change of
a corporate name or structure of Operator or transfer of Operator's interest to
any single subsidiary, parent or successor corporation shall not be the basis
for removal of Operator.


2. Selection of Successor Operator: Upon the resignation or removal of
Operator under any provision of this agreement, a successor Operator shall
be selected by the parties. The successor Operator shall be selected from the
parties owning an interest in the Contract Area at the time such successor
Operator is selected. The successor Operator shall be selected by the
affirmative vote of two (2) or more parties owning a majority interest based
on ownership as shown on Exhibit "A"; provided, however, if an Operator
which has been removed or is deemed to have resigned fails to vote or votes
only to succeed itself, the successor Operator shall be selected by the
affirmative vote of the party or parties owning a majority interest based on
ownership as shown on Exhibit "A" remaining after excluding the voting
interest of the Operator that was removed or resigned. The former Operator
shall promptly deliver to the successor Operator all records and data relating
to the operations conducted by the former Operator to the extent such records
and data are not already in the possession of the successor operator. Any
cost of obtaining or copying the former Operator's records and data shall be
charged to the joint account.





 The trial court found that Echelon, Tex-El, and BairTex had shown a probable
right of recovery because (i) Echelon, Tex-El, and BairTex--who were non-operators owning a
majority working interest under the joint operating agreements--affirmatively voted to remove
R & R Resources as operator and to select Leexus as operator; (ii) R & R Resources's improper
accounting and operation practices--which were a material breach of the standards of operation
and/or inability to meet the standards of operation and a material failure or inability to perform
obligations under the joint operating agreements--constituted "good cause" for its removal as
operator; and (iii) R & R Resources violated article V.B.1-2 of the joint operating agreements by
refusing to relinquish its operator status and transfer operations to Leexus after Leexus was
selected and appointed as successor operator of all the wells.

 Echelon, Tex-El, and BairTex's petition alleged that Leexus had a right to be the
successor operator based on a majority vote. The evidence included a letter that Echelon, Tex-El, and BairTex's counsel wrote to Doutel on April 30, 2004, advising that his clients had voted
to remove R & R Resources as operator for "good cause" pursuant to the joint operating
agreements' terms. The letter listed the ways in which R & R Resources had "failed and refused
to act as a reasonably prudent operator" and demanded that R & R Resources relinquish
operation of the wells. Doutel's May 28 response letter denied the request to relinquish
operation of the wells.

 R & R Resources urges that the trial court should have applied a gross negligence
standard. But the first paragraph of article V.B. in the joint operating agreements clarifies that
good cause for an operator's removal "shall mean not only gross negligence or willful
misconduct but also the material breach of or inability to perform its obligations under this
agreement." Furthermore, R & R Resources does not cite any authority supporting application
of an exculpatory clause that concerns the manner in which an operator conducts drilling
operations, as in article V.A. of these joint operating agreements, to equitable claims that do not
involve R & R Resources's "liability" for damages, or to claims for damages that are not based
on drilling operations. See Abraxas Petroleum Corp. v. Hornburg, 20 S.W.3d 741, 759 (Tex.
App.--El Paso 2000, no pet.); see also Cone v. Fagadau Energy Corp., 68 S.W.3d 147, 155
(Tex. App.--Eastland 2001, pet. denied).

 R & R Resources's alternative argument that the evidence in the record fails to
support its removal as operator for "failing or refusing to carry out its duties" is not persuasive. 
Failure to make prompt adjustments to an operating account and improperly assessed
charges--similar to the allegations in this case--have been bases for finding that an operator
"failed or refused to carry out its duties," which would support the entry of a temporary
injunction. See Tri-Star Petroleum Co., 101 S.W.3d at 589-90. Reviewing the evidence in the
light most favorable to the trial court's order, we cannot conclude the trial court abused its
discretion in finding that Echelon, Tex-El, and BairTex established a probable right of recovery
in support of their request for temporary injunction. We overrule R & R Resources's third issue.



Violations of Equity


 In its final issue, R & R Resources claims that the trial court's temporary
injunction violated the rules of equity because Echelon, Tex-El, and BairTex materially
breached the notice and removal provisions of the joint operating agreements and thus did not
have "clean hands" when they sought equitable relief. The evidence adduced at the hearing does
not support this contention. On April 30, 2004, Echelon, Tex-El, and BairTex gave R & R
Resources formal notice of the ways in which it had "failed and refused to act as a reasonably
prudent operator." Doutel's May 28 response letter did not address the majority of the other
allegations in counsel's letter. Almost four months 

after sending its demand letter, the Non-Operators requested the assistance of the Texas Railroad 
Commission via single-signature P-4s. That request was denied on November 19, 2004. The
Non-Operators did not seek an injunction against R & R Resources until May 18, 2005, when
they filed suit. R & R Resources's argument that it did not have thirty days to cure the Non-Operators' complaints is not persuasive. Similarly, its arguments that it did not have written
notice of the accounting discrepancies or receive a copy of the audit prior to the lawsuit are not
persuasive because they are not prerequisites to filing suit under the terms of the joint operating
agreements.

 R & R Resources's final argument is that the trial court's temporary injunction
violated the rules of equity because the temporary relief requested was identical to the permanent
relief requested. It claims that the Non-Operators' temporary injunction effectively
accomplished the entire purpose of their lawsuit and made the court's order a ruling on the
merits of whether R & R Resources should be removed as operator. A ruling on temporary
injunctive relief may not be used to obtain an advance ruling on the merits. See Iranian Muslim
Org. v. City of San Antonio, 615 S.W.2d 202, 208 (Tex. 1981). But Echelon, Tex-El, and
BairTex did not receive all the relief requested in their motion for temporary injunction or in
their petition. The temporary injunction does not cover the Toennis well. Additionally, the
petition makes claims for damages based on breach of contract and cloud on the title. Thus, the
trial court did not grant relief identical to that which the Non-Operators sought in their lawsuit
by issuing the temporary injunction concerning the Ullrich and Goebel Brothers wells. We
overrule R & R Resources's fourth issue.




Opportunity to be Heard at Subsequent Status Hearing


 In its fifth issue, R & R Resources urges that it was denied an opportunity to be
heard at a subsequent status hearing on September 5, 2005. R & R Resources argues that it
should have been able to present additional evidence on the issues of authority and irreparable
injury. The court had previously scheduled the status hearing to determine whether its
temporary injunction order was being followed, not as a continuation of the two-day temporary
injunction hearing held in June. We have found that the court had some evidence to support its
findings on the issue of authority--as noted in the earlier discussion of the Non-Operators'
standing to seek the temporary injunction--and irreparable injury. We also note that the court
agreed to conduct an in camera inspection on November 4, 2005, to address the issue of
Echelon, Tex-El, and BairTex's authority, thus R & R Resources had an additional opportunity
to raise this issue with the trial court. We overrule R & R Resources's fifth issue.


Impermissibly Speculative Order


 R & R Resources's sixth issue argues that the trial court's order was
impermissibly speculative because it did not make findings of gross negligence or willful
misconduct on the part of R & R Resources and that its findings on irreparable injury are not
supported by the evidence. We previously noted that article V.B.1 in these joint operating
agreements states that "good cause" for an operator's removal includes the operator's "material
breach of or inability to perform its obligations under th[e] agreement[s]" and found that the trial
court had some evidence to support its finding that R & R Resources "failed or refused to carry
out its duties" to support the entry of a temporary injunction. We also found that ongoing and
continuing harm resulting from an operator's refusal to relinquish operations is at least one basis
for finding irreparable injury in support of a temporary injunction. We overrule R & R
Resources's sixth issue.


 CONCLUSION


 Based on the record before us, R & R Resources has not shown that the district
court acted outside the bounds of reasonable discretion by granting the temporary injunction. 
Accordingly, we affirm the court's order.



 __________________________________________ Jan P. Patterson, Justice

Before Justices B. A. Smith, Patterson and Puryear

Affirmed

Filed: January 10, 2006

1. 
[1] A "working interest" is the operating interest under an oil and gas lease that is subject to
all costs of exploration and development. 8 Patrick H. Martin & Bruce M. Kramer, Williams &
Meyers Oil and Gas Law, Manual of Terms 1191 (2004).

2. 
[2] While these working interest owners bear the costs of exploration and development, they
also own a share of the production of oil and gas from the wells.
3. 
[3] Tex-El Oil and Gas, Inc. was previously known as Raytex Energy, Inc.
4. 
[4] Slayton's letter to Doutel stated that Echelon was in the process of obtaining an operator
number from the Texas Railroad Commission so that Echelon could take over operation of the wells.
5. 
[5] At the temporary injunction hearing, Slayton testified that the refunds were not paid until
about sixty days after R & R Resources's letter, which was seventeen months after the well was
drilled.
6. 
[6] The temporary injunction order was inapplicable to the Toennis well. The record shows
that, of the three wells in the underlying suit, the Toennis is the only well that is not expressly
covered by a joint operating agreement.
7. 
[7] R & R Resources stipulated that these statements constituted a proffer of two witnesses'
testimony, but it did not stipulate to the numbers.
8. 
[8] The Non-Operators' ownership percentages shown in Exhibit "A" reflect the amounts that
each owned before selling portions of their interests to investors. The parties stipulated to the
testimony concerning BairTex's and Echelon's interests in the wells, although R & R Resources did
not stipulate to the numbers.
9. 
[9] Article VII.D.1 permits the appointment of a new Operator "effective immediately" under
certain circumstances. The parties do not contend that this provision is applicable to this case.