**Liang "Benny" ZHAO, Appellant**

**v.**

**XO ENERGY LLC and XO Energy Worldwide, LLP, Appellees**

**In re Liang "Benny" Zhao, Relator**

**NO. 01–15–00937–CV, NO. 01–16–00053–CV**

Court of Appeals of Texas, Houston (1st Dist.).

Opinion issued May 5, 2016

Charles A. Sturm, Shannon Lang, Sturm Law, PLLC, Houston, TX, for Appellant.

Tom Van Arsdel, Jason R. Bernhardt, Winstead PC, Houston, TX, for Appellees.

Panel consists of Chief Justice Radack and Justices Keyes and Higley.

## OPINION

Sherry Radack, Chief Justice

Defendant/appellant/relator Liang "Benny" Zhao filed an accelerated interlocutory appeal and, later, a petition for writ of mandamus, both complaining of a temporary injunction requiring him to deposit money into the registry of the trial court during the pendency of the underlying lawsuit. We dismiss the interlocutory appeal for lack of jurisdiction. We deny the petition for writ of mandamus.

## BACKGROUND

### A. XO Energy's Allegations [1]

Plaintiffs/appellees/real-parties-in-interest XO Energy, LLC, and XO Energy Worldwide, LLLP (collectively, "XO Energy") are related wholesale electric utilities that trade financial and physical products in various competitive wholesale electricity markets, including (relevant to this case) the California Independent System Operator (CISO). XO Energy employs analysts who, among other things, are responsible for:

(i) creating production cost models to forecast nodal electricity price components; (ii) performing load flow analysis using industry tools; (iii) analyzing weather patterns and fuel prices to predict the base electricity prices; (iv) utilizing XO Energy's optimization models to forecast congestion and determine congestion drivers; (v) reviewing data using relevant databases and statistical tools; (vi) selecting nodes to trade based on forecasted congestion patterns; and (vii) entering bid curves.

### 1. Zhao's Employment

XO Energy hired Zhao as a Transmission/Congestion Analyst in December 2012. His employment contract required him to split his time 50/50 between Houston, Texas and St. Thomas in the U.S. Virgin Islands. The contract provided for an annual salary of $125,000 and additional, deferred compensation as part of XO Energy's discretionary incentive compensation and profit-sharing program. The contract also contained an anti-competition clause, prohibiting Zhao from engaging in any business competing with XO Energy for two years following termination of his employment. Finally, the contract obligated Zhao to maintain the confidentiality of XO Energy's trade secrets and confidential and proprietary information.

According to XO Energy, its protected Confidential Information includes the following types of information and documents:

a. Electronic data and information contained in Constraint Effects, the proprietary software developed and maintained by XOE that collects and reports congestion-related information and is critical to XOE's business decisions and product trades. Constraint Effects takes every Constraint/Contingency in an ISO and displays the Distribution Factor of each pricing node in the market relative to that Constraint/Contingency. Additionally, it measures the overall total pricing effect on each node from one or multiple constraints, based on historical or ad hoc Shadow Prices;

b. Secured maps and other similar Critical Energy Infrastructure Informa-

1. The facts recited in this section are taken from Plaintiffs' verified petition.

tion ("CEII"), which are the nuts and bolts of the transmission grids;

c. Electronic data and information contained in PowerWorld Simulator and other third-party software licensed and used by XOE, which include an interactive power system simulation package designed to simulate high voltage power system operation on a time frame ranging from several minutes to several days; and

d. Certain electronic data and information contained on XOE's email systems or exchanged and/or received by its employees through their XOE email accounts.

XO Energy alleges that its Confidential Information has been assembled over the course of many years at a substantial expense, and that it safeguards the information in a number of ways, including password protecting all of its databases containing this information, and limiting the distribution of certain portions of this information to upper level management or other employees who have a specific need for the information.

XO Energy maintains CEII clearance that it is required to apply for on an annual basis with the Federal Energy Regulatory Commission (FERC). CEII clearance allows it to access engineering and design information regarding existing and proposed critical infrastructure, including details about the production, generation, transmission, and distribution of energy, as well as strategic information beyond the location of such critical infrastructure. XO Energy does not distribute or allow access to its sensitive, Confidential Information containing the detailed information about its providers or its pricing information and matrixes to all employees. This information is shared only with those directly involved in relevant activities or operations. As a result of his employ-ment, Zhao had access to and been provided electronic or other copies of documents containing Confidential Information.

In his employment contract, Zhao agreed that if he breached the non-compete provisions of the Agreement or if his employment was (i) "terminated for Cause" by XO Energy or (ii) terminated "without Good Reason" by Zhao, Zhao "automatically forfeit[ed] any and all rights to any deferred Bonus or other deferred incentive compensation." Further, Zhao agreed that "any grant by [XO Energy] of such remuneration shall be automatically void."

The contract described good cause for termination as:

(i) [Zhao's] willful and continued failure to perform or to discharge his ... duties and responsibilities under this Agreement for any reason after XO Energy] has provided [Zhao] written notice of its intent to terminate his employment ...; (ii) any other willful misconduct by [Zhao] that is materially and demonstrably injurious economically to [XO Energy]; ... or (iv) Zhao's violation of any of the provisions of Section 5 [the noncompete provisions] of this Agreement.

**2. Zhao's breach of his Contract Obligations, Theft of Confidential Data, and Secret Preparations to Create a Company to Compete with XO Energy**

XO Energy alleges that, despite his obligation to work half the time in St. Thomas, Zhao worked remotely from Houston. After XO Energy confronted Zhao about this in mid-February 2015, even presenting the option to relocate to a different office, Zhao did not respond to the options offered by XO Energy and "began to noticeably distance himself from his co-workers."

XO Energy discovered later that during the period of February 18–26, 2015, Zhao

had remotely accessed its systems and engaged in the wholesale copying of its Confidential Information onto two external hard drives. He also copied data from XO Energy's proprietary Constraint Effect's database. In addition, he copied data and information contained in XO Energy's PowerWorld software (a tool used by power marketers), exported a copy of thousands of emails from his company account, and copied XO Energy's secured maps.

These activities were captured by XO Energy's Work Examiner data security software.[2] On February 27, 2015, Work Examiner also captured screenshots of a 'to-do' list Zhao prepared on his computer. According to this to-do list, Zhao intended to (i) start or register a new company; (ii) apply to CAISO to become a reliability coordinator or specialist; (iii) search for a computer science specialist; (iv) prepare a presentation and go to CAISO; and (v) attend a CAISO energy trading conference. XO Energy alleges that Zhao intended to engage in direct competition with XO Energy and was making plans to do so while employed by XO Energy, including carrying away XO Energy's Confidential Information to use in his competing business.

### 3. The late February 2015 distribution to Zhao

On or about February 27, 2015, XO Energy distributed its annual deferred incentive compensation to its employees. Zhao received a gross distribution of $715,070, and XO Energy direct deposited the net payment of $514,547 into Zhao's bank account. On that date, XO Energy also deposited an $18,000 "match" payment into Zhao's 401(k) account. XO Energy alleges that it would not have paid Zhao the February 27, 2015 deferred compensation had it had been aware of his unlawful acts.

### 4. XO Energy's Termination of Zhao's Employment

On March 6, 2015, XO Energy provided Zhao with written notice of its intent to terminate his employment for cause based on his unlawful copying of XO Energy's Confidential Information and preparing to compete in violation of the Agreement and his fiduciary obligations to XO Energy.

## B. Trial Court Proceedings

XO Energy sued Zhao for breach of contract and breach of fiduciary duties. As relief, it sought disgorgement of the $517,547 deferred compensation payment and the $18,000 matching 401(k) payment, as well as attorneys' fees and exemplary damages. It also sought an injunction prohibiting Zhao from removing the $532,547 from his bank and 401(k) account to deposit elsewhere outside of Texas.

XO Energy also pleaded for a pre-judgment writ of attachment, a temporary restraining order, and for temporary and permanent injunctive relief In addition to return of its money, XO Energy sought protection of its Confidential Information and to prohibit Zhao from unlawfully competing with XO Energy or soliciting its customers.

### 1. The Associate Judge's Temporary Injunction

XO Energy's request for a temporary injunction was first heard before a Fort Bend County Associate Judge at an evidentiary hearing on September 30, 2015. On October 2, 2015, the associate judge issued a temporary injunction providing

---

2. As part of its data security efforts, XO Energy utilizes "Work Examiner," an internet monitoring software. One of Work Examiner's key functions is to capture screenshots of the computers accessing its systems in various increments. XO Energy can later recall and review those screenshots.

the following (the provisions marked with asterisks were unopposed by Zhao):

The Court finds that it clearly appears from the facts set forth in Plaintiffs' Petition that unless Defendant is restrained, Plaintiffs will suffer irreparable injury if Defendant is allowed to use, disclose or otherwise retain or profit from any of Plaintiffs' confidential, proprietary or trade secrets information or use or remove from the State of Texas property, in the form of $532,547.95 in deferred compensation he obtained from Plaintiffs, inter alia, to fund and meet the capitalization and financial security requirements established for registering as a trading company or market participant with the California Independent System Operator ("CAISO") or similar market in the energy trading industry. The Court finds that it is reasonably probable from the specific facts contained in Plaintiffs' Petition that Plaintiffs will suffer immediate and irreparable injury, loss or damage unless such actions are enjoined until a final hearing on the merits can occur. The nature of the injury includes (i) the destruction and devaluation of Plaintiffs' confidential, proprietary, and trade secret information; and (ii) the loss, depletion or other injury to property consisting of $532,547.95 in deferred compensation Plaintiffs' paid Defendant in the event that he uses or removes the funds from the State of Texas. Accordingly, the Court finds that it should maintain the status quo and protect Plaintiffs from irreparable injury by entering a temporary injunction against Defendant. Based on the foregoing findings, it is hereby:

ORDERED that Defendant and any and all of his agents, employees, representatives and those in direct participation with them, who receive actual notice of this Temporary Injunction order, either directly or indirectly from:

a. contacting or soliciting any and all Plaintiffs' clients, customers, vendors or suppliers that Defendant came into contact with as an employee of Plaintiffs or for which he obtained confidential information about during his employment until final judgment, other order of the Court, or agreement of the parties;*

b. using, transferring, copying or disclosing any documents, information and/or electronic data that Defendant obtained access to as a part of his employment with Plaintiffs, including, but not limited to, the following:

i. documents, information and/or electronic data contained in or derived from Constraint Effects, the proprietary software developed and maintained by Plaintiffs;*

ii. secured maps and other similar CEII;*

iii. documents; information and or electronic data contained in or derived from PowerWorld Simulator and other third-party software licensed and used by Plaintiffs;*

iv. documents, information and/or electronic data contained in or derived from Plaintiffs' email systems;*

v. production cost and optimization models or forecasts;*

vi. congestion models or forecasts;* and

vii. load flow analysis.*

c. altering deleting destroying hiding secreting or otherwise removing from the jurisdiction of this Court any document, record, disc or other written or electronic data or media,

including those contained on any personal or business computer, hard drive or other device, which contains or describes any of Plaintiffs' confidential, proprietary, or trade secret information.*

It is further ORDERED that Defendant, on or before October 16, 2015, shall deposit into the registry of the Court the sum of $532,547.95, which represents the sum of deferred compensation that was deposited into Defendant's personal bank and 401K accounts and which he received from Plaintiffs on or about February 27, 2015, where such sums shall remain until further order of the Court.

It is further ORDERED that this Order and the restrictions contained herein shall continue from the date of the entry of this Order until a final judgment is entered in this case, unless terminated earlier by this Court or agreement of the parties.

It is further ORDERED that the final trial on the merits of this case be heard in the 240th Judicial District Court of Fort Bend County, Richmond, Texas, on the 1st day of December, 2015, at 9:00a.m.

## 2. The District Court's Temporary Injunction

Zhao requested and received a de novo temporary injunction hearing before the district court judge. Three days before that October 22, 2015 de novo hearing, Zhao filed an unverified answer and counterclaims. In addition to a general denial, he challenged the validity of his employment contract on several grounds, including lack of consideration, ambiguity, and voidness. He also pleaded that any alleged misconduct was justified, excused, ratified or excused and that XO Energy's claims are barred by estoppel, waiver and unclean hands.

As affirmative claims, Zhao pleaded breach of contract, and malicious prosecution, seeking declaratory relief as well as attorneys' fees and exemplary damages.

Both parties submitted briefing in support and in opposition of issuance of an injunction. XO Energy also issued a subpoena for Zhao to testify at the de novo hearing. Zhao moved to quash the subpoena and did not appear to testify. XO Energy provided the district court transcripts of the evidence presented in support of its temporary injunction at the hearing before the associate judge. The district court relied upon that evidence to rule in support of its issuance of another temporary injunction.

### a. The Evidence

John Charette, XO Energy's CFO, was the only testifying witness at the temporary injunction hearing. He testified to being familiar with the requirements for operating in the CISOP market. CISOP and XO Energy are both regulated by FERC. To register as a trader in CISOP, one requirement is a $500,000 deposit. Thus, if Zhao intended to start a business trading on the CISOP market, he would initially have to provide a $500,000 deposit.

Charette testified that XO Energy's traders and analysts have access to confidential and proprietary information, all the company's trading strategies, and confidential maps of the electricity grid. XO Energy is required to get Critical Energy Infrastructure Clearance (CEII) from FERC and renew it each year. That requires the company to execute nondisclosure agreements, as well as secure nondisclosure agreements from each of its employees, which included Zhao. The secrecy is based primarily on national security concerns, as the secured maps con-

tain vital information about the electrical grids throughout the country.

Charette testified to the circumstances around XO Energy offering Zhao a job, which was contingent upon his executing an employment agreement and information policies. These executed agreements were entered into evidence. The employment agreement contains a two-year noncompete clause, which is required because XO Energy spends a "great deal of time, money and effort training employees on [its] methods for trading in these markets." It also provides that Zhao automatically forfeits all deferred bonuses and compensation if he is terminated for cause.

Charette testified that management met with Zhao to tell him that he needed to decide between going to St. Thomas or the company's Pennsylvania office, as he was the only employee not working in one of those two locations. He also testified that Zhao's not working half of his time in St. Thomas was already in violation of his contract. At that same meeting, Zhao was told what his bonus for the year would be, and when it would be paid. Zhao did not give a decision at the time about whether he would transfer as a condition of staying employed with the company.

The day after that meeting (around February 12, 2015), Shawn Sheehan, XO Energy's owner and CEO, turned on the Work Examiner software that recorded screenshots of Zhao's work computer. The captured screen shots were not reviewed until February 25. February 25 was also the day that the payroll department called in all employees' bonus amounts to be paid on February 27, 2015.

Charette testified that the screen shots showed Zhao's work computer was connected to an external hard drive that was not provided by or owned by the company. The screen shots reflected that thousands of files were being copied from XO Energy's network to this external hard drive, including proprietary software information, maps, and emails. Charette testified that no one from XO Energy authorized Zhao to copy any of these files and that there was no legitimate reason for Zhao to have done so.

The screen shots also captured information about CAISO and the requirements for setting up a new entity on CAISO and to start trading on that entity. The screen shots captured a to-do list written partly in Chinese and partly in English. Next to CAISO information, "deposit" was typed in English. Charette testified that, based on his experience dealing with CAISO, he understood this to be a reference to the cash deposit required to become a member of CAISO. Also, written in English, was the statement "California ISO and the first reliability coordinator." Charette testified that a "first reliability coordinator" is what a person or entity is called that is a member of CAISO.

The screen shot to-do list also contained, in English, the phrases "computer science" and "oracle and access." Charette testified that "oracle and access" are programming languages that XO Energy used to develop its proprietary software.

Sheehan, the first person to review Zhao's screen shots, called Charette late in the evening of February 26 to tell him what he had found. At that time, the bonus payments, including Zhao's, were already being processed by the bank to be deposited within two days into the employees' accounts. Charette tried to reach the payroll company immediately. He was able to leave a message and received a call back later that night from a payroll company employee. Charette asked her to stop Zhao's payments if possible. She responded that she would work on that first thing the next morning. By 9:00 a.m. the follow-

ing morning, she called Charette back and told him that it was too late to stop the payment to Zhao because Automatic Clearing House (ACH) rules prevented a transfer over the amount of $100,000 from being reversed at that point in the process.

Based on what Sheehan and Charette saw on the screen shots, XO Energy terminated Zhao for cause.

Charette testified that, based on the screenshot information from Zhao's computer, he was concerned that Zhao would use the funds he received to make a $500,000 deposit with CAISO to become a market member and directly compete with XO Energy. This belief was bolstered by the screen shots indicating that Zhao had very recently been looking at CAISO membership requirements.

Finally, Charette testified that, as an officer of XO Energy, he believed that Zhao was not entitled to the bonus that was paid to him because Zhao had already breached his contract, thus forfeiting his right to the payment, before the payment was made.

On cross-examination, Charette was asked about XO Energy's corporate structure. XO Energy, LLLP is the software entity, and XO Energy LLC is the management company. The trading companies are all subsidiaries of XO Energy, LLC and XO Energy Worldwide. Zhao was employed by XO Energy LLC, utilizing software for XO Energy LLLP, and trading for XO Energy Cal LP and XO Energy Cal LLP.

Charette testified that he was aware that the company sent a representative to Zhao's home to collect all of his work equipment. He was also aware that Zhao sent an email to Sheehan and another XO Energy employee on March 2, 2015 referencing the removal of this equipment and a conversation Zhao had with a different employee on March 28—the day after receiving his bonus—in which he indicated he was resigning.

Charette testified that he was not aware of Zhao's giving XO Energy's files to anyone else, and that two external hard drives were recovered from Zhao's home containing XO Energy's files when representatives retrieved equipment on February 28, 2015. Charette was aware that, due to a federal investigation, the company was instructed to back-up and not delete any files. He stated that he was not aware of Zhao being personally instructed to back up files and that, in fact, the company remotely backs up the data on all its employees' files.

#### b. The District Court's Ruling

The parties summarized their arguments, with XO Energy contending that the bonus payment to Zhao was wrongful and requesting that he be required to deposit it into the registry of the court. XO Energy emphasized that there is some indication that Zhao was planning to join CAISO to wrongfully compete with XO Energy and that the CAISO membership fee is almost the same amount as the wrongfully paid bonus. Zhao's counsel argued that there was nothing improper about Zhao's backing up company materials onto a hard drive before he resigned because there was an ongoing federal investigation, and it might be needed as evidence. Zhao's counsel also argued that, given XO Energy's corporate structure, he may not be prohibited from competing with some XO Energy entities because he allegedly only signed an employment contract with one of the entities.

At the close of the hearing, the court announced that it was leaving the temporary injunction in place, but gave the parties the option of (1) a quick hearing, within a week, for Zhao and any other desired

witnesses to come testify in support of or against continuing the temporary injunction or, alternatively, (2) a priority trial date on the merits. The court specifically stated it would be helpful to hear from Zhao (who had quashed XO Energy's subpoena to compel his testimony at the hearing). XO Energy was agreeable to another hearing with more live testimony from Zhao and others, but Zhao's counsel objected and requested that the case instead be set for trial. The court set a trial date of December 15, 2015. After the parties asked for a continuance until April, the court set the trial for March 22, 2015. The court's docket now reflects a July 2016 trial date.

Zhao brought this interlocutory appeal of the trial court's temporary injunction, Tex. Civ. Prac. & Rem.Code Ann. § 51.014(a)(4) (West 2014). In response to XO Energy's motion to dismiss his appeal for want of jurisdiction, Zhao also filed a petition for writ of mandamus challenging the same order to deposit funds into the registry of the court.

## ISSUES ON APPEAL

Zhao appellant's brief raises one issue: "Whether the Trial Court erred in issuing a prejudgment, temporary injunction requiring that Defendant–Appellant deposit into the Registry of the Court, during the pendency of the lawsuit, the total sum of money sought by Plaintiffs–Appellees as money damages for their breach of contract and breach of fiduciary duty claims."

## JURISDICTION

XO Energy filed a motion to dismiss Zhao's interlocutory appeal, arguing that "the requirement that Appellant deposit funds in the court registry is not injunctive relief but rather attachment relief that cannot be addressed in an interlocutory appeal." XO Energy relies primarily on *Behringer Harvard Royal Island, LLC v. Skokos*, No. 05–09–00332–CV, 2009 WL 4756579, at *2 (Tex.App.–Dallas Dec. 14, 2009, no pet.) (mem.op.). The appellant in that case complained on interlocutory appeal that a temporary injunction requiring $10 million dollars be deposited into the court's registry was improper. *Id.* at *1–2. The Dallas Court of Appeals held that, despite the trial court's characterizing its order to deposit money into the court registry to ensure it remained to satisfy any judgment as a temporary injunction, it was actually a pre-trial writ of attachment from which no interlocutory appeal lies. *Id.* at *2 ("We conclude the appealed from order does not grant injunctive relief. Because there is no authority for an interlocutory appeal from the order, we dismiss the appeal for want of jurisdiction."). The court granted mandamus relief however, reversing the district court's order that the appellant deposit money into the court registry. *Id.*

Zhao responds that, in XO Energy's "Brief in Support of Temporary Injunction," it explicitly stated it was seeking "injunctive relief—not a writ of attachment—and that it could '*only* be protected by issuance of a temporary injunction that require[es Zhao] to immediately deposit into the registry of the Court'" the funds at issue. And he cites cases, including one from this Court, addressing pre-trial attachment of funds or personal property (but not cases involving deposit of money into the registry of the court) on interlocutory appeal. *E.g., Harper v. Powell*, 821 S.W.2d 456, 456–57 (Tex.App.–Corpus Christi 1992, no writ) (reversing, on interlocutory appeal, "temporary injunction prohibiting appellant from disposing of $30,000, a portion of the proceeds he realized from the sale of inherited real property" that was sought by his ex-wife to satis-

fy a contractual promise to pay for their child's college); *Telephone Equip. Network, Inc. v TA/Westchase Place, Ltd.*, 80 S.W.3d 601, 610 (Tex.App.–Houston [1st Dist.] 2002, no pet.) (addressing pretrial injunction prohibiting third party from foreclosing on, or disposing of, certain property on interlocutory appeal while rejecting argument that injunction was actually attachment from which no appeal would lie).

Our own research confirms that most, if not all, interlocutory appeals in cases involving challenges to orders to deposit money into a court registry have been dismissed for want of jurisdiction, even when the order is labeled a "temporary injunction." *E.g., Structured Capital Res. Corp. v. Arctic Cold Storage, LLC*, 237 S.W.3d 890, 894 (Tex.App.–Tyler 2007, no pet.) ("An order requiring the deposit of funds into the registry of a court cannot be characterized as an appealable temporary injunction, even if entered in response to a motion for injunctive relief."); *Lovall v. Yen*, No. 14–01–01108–CV, 2002 WL 58925, at *1 (Tex.App.–Houston [14th Dist.] Jan. 17, 2002, no pet.) (mem.op.) (rejecting argument that temporary injunction requiring appellant to deposit money into court registry was actually temporary injunction, and thus dismissing interlocutory appeal for want of jurisdiction); *Faddoul, Glasheen & Valles, P.C. v. Oaxaca*, 52 S.W.3d 209, 212 (Tex.App.–El Paso 2001, no pet.) (concluding that "the second part of the order, requiring the deposit of funds into the registry of the court, is not injunctive relief and not subject to an interlocutory appeal"); *Diana Rivera & Assocs., P.C. v. Calvillo*, 986 S.W.2d 795, 798 (Tex.App.–Corpus Christi 1999, no pet.) (holding that, despite order to deposit money into registry of court being contained within temporary injunction, orders to deposit money into registry of court cannot be characterized as appealable temporary injunctions);

*Furr v. Furr*, 346 S.W.2d 491, 495 (Tex. Civ.App.–Fort Worth 1961, writ ref'd n.r.e.) (an order directing payment of money into court, although entered on motion for injunction, would not be deemed temporary injunction from which appeal would lie); *Alpha Petroleum Co. v. Dunn*, 60 S.W.2d 469, 471 (Tex.Civ.App.–Galveston 1933, writ dism'd) (orders to deposit money into registry of court cannot be characterized as appealable temporary injunctions).

■ We thus agree with XO Energy that a pretrial order, whatever the label, to deposit funds into the registry of the court to satisfy a potential judgment is not a temporary injunction for which an interlocutory appeal lies. We thus grant XO Energy's motion to dismiss Zhao's interlocutory appeal for lack of jurisdiction, and we address the merits of his challenges to the order raised in his petition for writ of mandamus. *See O'Brien v. Baker*, No. 05–15–00489–CV, 2015 WL 6859581, at *1 (Tex.App.–Dallas Nov. 9, 2015, orig. proceeding) (mem.op.) (conditionally granting petition for writ of mandamus and dismissing interlocutory appeal of order requiring defendant to deposit $4 million into registry of court).

### MANDAMUS

■ Mandamus will issue only to correct a clear abuse of discretion for which the relator has no adequate remedy at law. *In re Prudential Ins. Co. of Am.*, 148 S.W.3d 124, 135 (Tex.2004) (orig.proceeding); *Walker v. Packer*, 827 S.W.2d 833, 839–40 (Tex.1992) (orig.proceeding). "A trial court has no 'discretion' in determining what the law is or applying the law to the facts," and "a clear failure by the trial court to analyze or apply the law correctly will constitute an abuse of discretion." *Walker*, 827 S.W.2d at 840.

■ A trial court has two routes of authority to order money to be deposited in the registry of the court. The court may, in compliance with section 61.001 of the Texas Civil Practice and Remedies Code, issue a writ of attachment. The court may also, in exercise of its inherent authority "order a party to pay disputed funds into the court's registry if there is evidence the funds are in danger of being 'lost or depleted.'" *In re Reveille Resources (Texas), Inc.*, 347 S.W.3d 301, 304 (Tex.App.–San Antonio 2011, orig. proceeding) (citing *Castilleja v. Camero*, 414 S.W.2d 431, 433 (Tex.1967)).

## ANALYSIS

■ Zhao argues that the evidence before the trial court was insufficient to justify its ordering him to deposit money into the registry of the court.[3] Although Zhao acknowledges that XO Energy abandoned its request for a writ of attachment under Chapter 61 of the Texas Civil Practice and Remedies Code, Zhao's mandamus arguments are nonetheless focused on XO Energy's failure to satisfy the requirements for a writ of attachment under that statute. Because XO Energy has not argued that it met the requirements for a writ of attachment, we limit our analysis to whether the trial court was within its discretion to order Zhao to pay funds into the registry under its "inherent authority."

In response to Zhao's petition for writ of mandamus, XO Energy argues that (1) Zhao waived his right to mandamus relief by failing to address the trial court's inherent authority to order money to be deposited into the court registry and by failing to address whether he had an adequate remedy by appeal, (2) the trial court's order to deposit disputed funds into the registry until ownership was established was within its discretion because the only evidence presented demonstrated it was at risk of being lost or depleted, and (3) Zhao has an adequate remedy by appeal because, if he wins at trial, he gets the funds back, and because XO Energy complied with the trial court's order to post a bond to cover any damages Zhao would allegedly suffer while he was deprived of the money in the registry.

■ The supreme court recognized in *Castilleja* that when the ownership of specific funds is in dispute, and the funds are at risk of "being lost or depleted," the trial court may order the funds deposited into the registry of the court until the ownership issue is resolved. 414 S.W.2d at 433 (holding that trial court had authority to order winning lottery ticket proceeds into registry of court while ownership of funds were determined because evidence was presented that proceeds were at risk of loss or depletion). When there is insufficient evidence presented that "funds are in danger of being 'lost or depleted,'" however, the trial court abuses its discretion by ordering funds deposited in the registry of the court and mandamus relief from such an order is appropriate. *E.g., In re Reveille Res. (Texas), Inc.*, 347 S.W.3d at 304 (trial court abused its discretion when there was no evidence of possible depletion of funds and trial court based injunction solely on statement by counsel during hearing rather than evidence); *N. Cypress*

3. The majority of the narrative provided in the fact sections of Zhao's appellant's brief and petition for writ of mandamus is based on the facts recited in his unsworn answer. We do not address arguments he makes based on these pleadings, but instead focus only on the evidence before the trial court. We also note that, in addition to Zhao's refusing to testify at the temporary injunction hearings, his attorneys declined the trial court's offer to allow them to return for another hearing to present testimony and evidence in support of Zhao's theory and opposition to XO Energy's request for an injunction.

*Med. Ctr. v. St. Laurent*, 296 S.W.3d 171, 178–79 (Tex.App.–Houston [14th Dist.] 2009, orig. proceeding) (trial court abused its discretion when there was no evidence that funds at issue were at risk of being lost or depleted, but only that disputed partnership funds were in same bank account that partnership actively used to fund several business activities); *In re Deponte Invs.*, No. 05–04–01781–CV, 2005 WL 248664, at *2 (Tex.App.–Dallas Feb. 3, 2005, orig. proceeding) (mem.op.) ("[T]he Allens were required to present evidence the revenues in Deponte's possession were in danger of being lost or depleted. They did not do so. We conclude that absent any evidence, the trial court abused its discretion in ordering Deponte to deposit the funds into the registry of the court.").

▐ A trial court also abuses its discretion by ordering disputed funds be deposited into the registry of the court without allowing the party resisting the order an opportunity to put forth evidence disputing the validity of the movant's claim. *See In re Noteboom*, 111 S.W.3d 794, 796–97 (Tex. App.–Fort Worth 2003, orig. proceeding) ("[T]he record reflects the trial court was attempting the admirable goal of safeguarding sufficient assets necessary to satisfy any future money award on final judgment of the case; however, by refusing to permit Noteboom the opportunity to introduce evidence concerning the merits of the claims prior to the trial court's setting of the bond amount [to be paid into the registry of the court], the trial court failed to afford Noteboom the procedural due process to which he was entitled.").

In this case, Zhao was given more than one opportunity, which he declined, to present testimony and evidence challenging the contention that he violated his employment agreement, that he planned to use XO Energy's confidential data and, most importantly, that he planned to use the bonus he allegedly wrongfully received to set up an entity to operate in CAISO.

In contrast, in support of its request for an injunction, XO Energy presented the trial court with uncontroverted evidence by Charette that:

- Zhao violated the terms of his employment agreement;
- Zhao's employment was terminated "for cause";
- Zhao forfeited his bonus payment under his employment agreement when he was terminated for cause;
- XO Energy did not intend to pay Zhao a bonus when it discovered that Zhao had violated his employment contract;
- When XO Energy discovered that Zhao had violated his employment agreement, it immediately attempted to stop payment of Zhao's bonus, but it was too late;
- Zhao had very recently been researching the requirements to set up a new entity to become a member of CISOP;
- The fee to become a member of CISOP is almost the entire amount of the allegedly wrongfully paid bonus;
- Next to a list of CAISO membership information, Zhao had typed, in English, "deposit," which Charette understood to be a reference to the $500,000 cash deposit required to become a member of CISOP;
- Charette believed that Zhao likely planned to use his disputed bonus funds to become a member of CAISO;
- Zhao had copied confidential files that Charette believed were taken for the purpose of competing with XO Energy (even though there is no evidence that Zhao had yet used or

transmitted the information to anyone else).

Given this uncontroverted evidence about Zhao's breach of his employment agreement, coupled with the unusual circumstances presented with the timing of the bonus payment and the circumstantial evidence that Zhao might have been planning to use the disputed bonus funds for a CAISO membership, we do not agree with Zhao that the trial court abused its discretion by ordering the allegedly wrongly paid funds deposited into the registry of the court. The court was presented with some evidence that the funds may otherwise be lost or depleted by Zhao's paid membership to CAISO.

Zhao nonetheless argues in his petition for writ of mandamus that, based on Charette's testimony, the $500,000 a new member pays to CAISO is only for the purpose of gaining membership in the market, i.e., it cannot be traded against. From this, Zhao's counsel contends that if Zhao spends his disputed bonus to become a member and Zhao ultimately loses the underlying lawsuit, Zhao could recover the money. But while Charette did testify that CAISO considers the initial $500,000 a type of cash collateral, he *did not* testify that Zhao could, or under what circumstances, recover this money back from CAISO. Although Zhao's counsel had the opportunity, he neither questioned Charette about recovery of the money (despite Charette being very familiar with CAISO's workings), nor did he present evidence on Zhao's behalf of Zhao's intentions or availability of other funds.

In sum, we conclude that this case is distinguishable from the cases in which similar orders have been reversed for lack of evidence presented that the disputed funds may be lost or depleted. To grant the mandamus relief Zhao requests here, we would have to conclude that the trial

court's decision was so arbitrary and unreasonable as to amount to clear and prejudicial error. *See Walker*, 827 S.W.2d at 839. We may not substitute our judgment for that of the trial court with regard to its factfinding and its credibility determinations as to Charette; nor can we disturb the trial court's decision unless we find it arbitrary and unreasonable. *In re Mabray*, 355 S.W.3d 16, 22 (Tex.App.–Houston [1st Dist.] 2010, orig. proceeding).

## CONCLUSION

Zhao's interlocutory appeal is dismissed for lack of jurisdiction, and his petition for writ of mandamus is denied.